UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JAMES BECTON          )
                      )
                      )    Cr.  No. 07-131-01-(GK/JMF)
     v.               )
                      )
UNITED STATES OF AMERICA )
_____)

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION UNDER 28
U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE
BY A PERSON IN FEDERAL CUSTODY

The United States, by and through its representative, the

United States Attorney for the District of Columbia, respectfully

opposes defendant's Motion under 28 U.S.C. § 2255 to Vacate, Set

Aside, or Correct Sentence By A Person in Federal Custody, filed

pro se on July 12, 2011, which should be denied summarily.

PROCEDURAL BACKGROUND

On October 17, 2007, defendant was charged by a federal grand

jury in a superceding indictment with, inter alia, conspiracy to

distribute and possess with intent to distribute ("PWID") cocaine,

cocaine base, and marijuana between 1995 and May 2007, in violation

of 21 U.S.C. § 846 (Count 1), and 17 counts of use of a telephone

to facilitate the conspiracy, in violation of 21 U.S.C. § 843(b)

(Counts 20, 29-31, 40, 47-56, 58, 62).[1]

_____

[1]      "A." refers to the Appendix, and "R.M." refers to the
Record Material, filed by the defendant and the government,
respectively, in the appellate proceeding.  We will be filing,
soon, the Record Material in its entirety and excerpts from the
Appendix.  Further, the Declaration of Edward C. Sussman, Esq.
(October 15, 2012), is attached hereto.  Finally, "Tr. Tr." is a
reference used by defendant to indicate the continuously-paginated
trial transcript.

From September 15-29, 2008, the Honorable James Robertson presided over defendant's jury trial, including six days of testimony and three days of deliberations.  On September 30, 2008, the jury found defendant guilty of conspiracy, and 10 counts of telephone use to facilitate the conspiracy (Counts 20, 29, 47-49, 51-53, 56, and 58).  Defendant was acquitted of the remaining seven telephone counts (Counts 30-31, 40, 50, 54-55, 62).[2]

On October 16, 2008, defendant filed a motion for a new trial, which was denied on February 11, 2009.  On February 5, 2009, Judge Robertson sentenced defendant to serve 300 months in prison on Count 1, followed by a 120-month term of supervised release, and concurrent, lesser terms for the 10 telephone use counts, and to pay a $1,100 special assessment (R.M. 162-63).  Defendant noted a timely appeal on February 5, 2009.  The appellate proceeding, at

---

[2]    Nine co-defendants were named in the superceding indictment.  Defendant and Christopher Becton were the only defendants who had proceeded to trial as of the date of defendant's appellate proceeding.  After the jury acquitted Christopher Becton of PWID cocaine and failed to reach a verdict on the conspiracy count, he pled guilty to conspiracy and was sentenced on February 24, 2009, to 42 months of incarceration.  Charges against all but one of the remaining defendants were resolved through plea agreements and/or dismissals.  One defendant, Frederick Mercer, who had fled the jurisdiction after indictment, pled guilty on August 12, 2010 to conspiracy to distribute and possess with intent to distribute 280 grams or more of cocaine base and 5 kilograms of cocaine, in violation of 21 U.S.C. § 846 (Count One), and conspiracy to launder monetary instruments, in violation of 18 U.S.C. § 1956(h) (Count Two).  On January 7, 2011, Mercer was sentenced to ten years of imprisonment and three years of supervised release on Count One, to run concurrently with an identical sentence imposed on Count Two.

which defendant was represented by new counsel, concluded on April 16, 2010, when the D.C. Circuit affirmed the judgment and the denial of the new trial motion.  <u>United States v. Becton</u>, 601 F.3d 588 (D.C. Cir. 2010).  On July 12, 2011, defendant filed his pro se Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence By A Person in Federal Custody ("§ 2255 Mot.").  In this motion, defendant claims that his highly experienced trial counsel, Edward C. Sussman, Esq, rendered ineffective assistance in connection with trial and sentencing.[3]

<u>TRIAL EVIDENCE</u>

<u>Government's Case-In-Chief</u>

From 2001 through 2005, Christian Donaldson, defendant's sometime girlfriend and the mother of one of his children, sold crack cocaine in the parking lot known as the "second court" outside her apartment building, as well as inside the building, in the 4200 block of 4th Street, S.E., in Washington, D.C. (A. 502, 507-08, 553; R.M. 13, 20).  Defendant James Becton regularly provided Donaldson with crack cocaine to sell and showed her how to cut up a 3.5-ounce "eight ball" of crack cocaine into smaller rocks ("dimes") for individual sale (A. 507-09, 514).  Donaldson saw defendant "very frequently" make hand-to-hand sales to "crackheads" in another parking lot on Fourth Street known as "the pit" (R.M.

---

[3]   Mr. Sussman was admitted to the D.C. Bar in 1973. Declaration of Edward C. Sussman (attached), ¶ 1.

11-12; A. 504-06, 511).  Defendant's brother, Willie Best, also sold crack cocaine, but only in larger quantities such as eight-balls, quarters (7 grams), half ounces, or ounces (A. 511, 514).  Defendant himself also sold "weight" (large quantities of cocaine) to other dealers (A. 512).

Donaldson observed defendant gradually assume control of all crack sales made in the "pit" and the second court on Fourth Street by: supplying crack cocaine to all of the sellers there; establishing a seniority-based "rotation" for dealers dictating who would make the next sale; employing recently-incarcerated sellers whom defendant James Becton had taken under his wing; "slapping" crackheads who did not follow his instructions; and releasing his dog on competing sellers (R.M. 14, 16-21; A. 534).  Defendant routinely stored large quantities of crack cocaine in Donaldson's apartment for distribution (A. 514-15.R.M. 9-10; A. 499, 502, 515-17.)  Donaldson also sometimes held a "little black gun" for defendant (R.M. 22-23).  On one occasion, defendant shot a rival dealer, Russell Harris, for refusing to leave the second court (R.M. 24-26, 56; A. 570-71, 573-74).[4]

Defendant purchased powder cocaine locally from "White Mike" in quantities as large as half a kilogram ("kilo"), or "half a brick" (R.M. 27-28).  Defendant was shot while attempting to

---

[4]    There was testimony that defendant had been found not guilty of this shooting (A. 577-78).

purchase cocaine in Los Angeles for resale in the District of Columbia (R.M. 33-35). Donaldson saw defendant process large quantities of cocaine powder into crack cocaine for sale by mixing it with baking soda and cooking it in a Pyrex pot (R.M. 29-32).

While defendant was incarcerated from October 2003 to the spring of 2005, he "was still telling [Donaldson] where to get the work from" so that she could continue to "hustle on 4th Street," arranging for her to obtain crack cocaine for sale from a contact known as "Squirt" (Russell Ramseur), one of the sellers to whom defendant had been supplying crack before his incarceration (A. 531-32; R.M. 38, 42-43, 101). Donaldson also continued to obtain crack cocaine from Fred Mercer, who was supplied and authorized to deal on Fourth Street by defendant (R.M. 19-20, 42-43). Donaldson "had to keep it on cool grounds . . . with [defendant]" because even from prison, he still "had the ability" to control who was allowed to sell crack cocaine on Fourth Street (R.M. 38). At first, while defendant was held at the D.C. Jail, he asked Donaldson "to bring [him] some coke" (R.M. 36, 38). After defendant was moved to a federal prison in North Carolina, he asked Donaldson to bring him a cell phone, marijuana, and "a 10 or a 20-pack of dope [heroin]," which defendant planned to sell in prison for $100 a pack instead of the usual street price of $10 (R.M. 36, 38-39). Defendant instructed Donaldson to obtain the heroin from "Squirt," and Donaldson was "under the impression that

[defendant] and Squirt had already talked because when [Donaldson] called Squirt . . . Squirt gave it to [her]" (R.M. 39-40). Donaldson obtained the marijuana from Keith Sampler (known as "Son" or "Son Son"), another crack dealer on Fourth Street who was supplied by defendant (R.M. 2, 15-16, 41). Donaldson delivered the cell phone, marijuana, and heroin to defendant in prison with the assistance of a prison guard (R.M. 40-41).

Donaldson moved away after defendant's release from prison in 2005, but upon her return to the District of Columbia in 2007, defendant continued to supply her with crack cocaine to sell (R.M. 42, 44-45). At that time, several other people were also being supplied by defendant with crack cocaine in large quantities (eight-balls and quarters) for resale (R.M. 47).

In late 2003 or early 2004, Jaquan Best began dealing crack cocaine in the 4200 and 4300 blocks of Fourth Street, S.E. (A. 583-84). Initially, he obtained his supply from a man named Phil on Fourth Street, but when Mercer, Jaquan's cousin, told Jaquan that "all the money need[s] to stay in the family," he began purchasing quarter- and half-ounce supplies of crack cocaine three or four times a week from Mercer instead (A. 588-91). Mercer got his cocaine from defendant, who "was running the show" (A. 594, 596-97).

Mercer, defendant's "second" in command, schooled Jaquan in the rules of "the program," under which sellers were not supposed

to leave the courts or the pit in the Fourth Street area without first selling all of the cocaine they had so that it would not be found on them if the police stopped them upon leaving (A. 597; R.M. 64). Also, "anything might happen, so . . . you kept a gun just in case" (R.M. 65). Sellers were also expected to take turns making sales in a "rotation" and were permitted to sell crack only if it had been supplied by someone else "in the program, in the circle"; cocaine from other sources was not allowed (R.M. 65, 69). Sellers or buyers of competing sources had their drugs stolen, were "slap[ped] . . . around," or faced defendant's pit bulls, "Juice" and "Rampage," who were released to "bite [them] up" (R.M. 66-67). Various apartments on Fourth Street were used by people in "the program" to sleep, "stow the dogs," "cut" crack cocaine, or "throw your gun in there or your coke or whatever, if you're going somewhere" (R.M. 73-74).

Gina Taylor, the mother of one of defendant's children, began dating defendant in May or June of 2003 (R.M. 92-94). She knew he was a drug dealer and often accompanied him to Fourth Street when defendant stopped there to collect "stacks" of cash (R.M. 94-96; A. 635). Sometimes, people would bring money to defendant as he sat in his car, or defendant would direct people who owed him money to leave it with a designated person on Fourth Street such as Mercer or Christopher Becton (A. 636-38).

After defendant was jailed in October 2003, he instructed Taylor to collect cash from his associates to pay his attorney's fees (A. 642). Taylor did so, collecting $2,000 from "White Mike," $1,000 from "Squirt," $1,000 from "Phil," $2,500 from Willie Best, and additional cash from several others on Fourth Street, between December 2003 and March 2004 (A. 642-46). Taylor also set up the voice-mail function on the cell phone that Donaldson had arranged to smuggle to defendant through a prison guard (A. 647-48).

Upon defendant's release from prison in May 2005, Keith Sampler, one of defendant's dealers from Fourth Street, gave defendant a gray Lexus and about $700, and defendant resumed his pre-incarceration routine of going to Fourth Street to collect stacks of cash (R.M. 2, 97; A. 660-61). Defendant moved in with Taylor and used her apartment to manufacture crack cocaine with Mercer (A. 652-55, 660), and to store gallon-sized Ziploc bags full of marijuana that defendant split up into smaller bags for sale (R.M. 98-99). Taylor sometimes sold the marijuana herself (R.M. 99).

Russell Ramseur ("Squirt"), defendant's cousin, had been a drug dealer in Washington, D.C., since 1995, beginning on Livingston Road, S.E. (R.M. 109; A. 698). In 1999, Ramseur's fellow Livingston Road dealers began going to the 4200 block of Fourth Street, S.E., to obtain their supply for sale on Livingston Road because there was "[a] lot of traffic in and out [of] the

courts" on Fourth Street, and cocaine could be purchased for resale there from Willie Best (A. 698-701).  By 2002, Ramseur and other Livingston Road dealers had migrated to the 4300 block of Halley Terrace, S.E., to sell crack cocaine (A. 702).  In 2002 and 2003, Ramseur saw defendant or Willie Best "[o]n a daily basis" pull up in a car in the 4300 block of Halley Terrace and supply cocaine to the dealers there (A. 705).

In 2003, Gina Taylor asked Ramseur for some money to help defendant pay his lawyer, and Ramseur gave her "1,000 to 1,500 dollars" (R.M. 110).  Christian Donaldson asked Ramseur to supply her with heroin and crack cocaine so she could deliver it to defendant in prison (R.M. 111-12).  After defendant called Ramseur from custody to confirm that he had made that request, Ramseur provided Donaldson with cocaine and heroin to deliver to defendant (R.M. 112-13).

By the time defendant was released from prison in 2005, Ramseur was purchasing half-kilos and full kilos of powder cocaine for $12,000 and $22,000 each, respectively, and converting them into crack cocaine (A. 713).  Because Ramseur and defendant's relationship had become "stronger," they "started doing drug transactions together" in which defendant would procure "major weight" (half a kilo or a kilo of powder cocaine) for Ramseur, or vice versa, two or three times a month (R.M. 114-15, 131).  Defendant "always [knew] people with major quantities of cocaine,"

including Willie Best and "Mike" (R.M. 115-16). Ramseur and defendant often arranged for these transactions using cell phones, employing codes to refer to drugs and quantities (R.M. 116-17).

The jury heard recordings of about 50 cell phone conversations intercepted via wiretaps, many of them involving defendant (see, e.g., 9/22/08 Tr.654-57; 9/23/08 Tr. 953-74).

### Court of Appeals' Decision Affirming The Convictions

On appeal, through new counsel, defendant challenged (1) the district court's denial of his motion to suppress evidence obtained from wiretaps on his and his coconspirators' cell phones, (2) the district court's refusal to hold a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978), concerning the government's alleged failure to disclose certain information bearing on the credibility of two sources on which it relied in affidavits supporting the wiretap applications, and (3) the district court's denial of his motion for a new trial. In that motion, defendant had argued that Judge Robertson had erroneously admitted evidence of defendant's actions while he had been incarcerated from 2003 to 2005, as direct proof of the charged conspiracy, including his receipt of drugs and a cell phone, and that he improperly allowed the government to inform the jury in its rebuttal that defendant had been in prison between 1995 and 2000. United States v. Becton, 601 F.3d 588, 591-92 (2010).

10

On April 16, 2010, the D.C. Circuit affirmed Judge Robertson's rulings.  First, it held that the District Court, the Honorable Colleen Kollar-Kotelly, did not abuse its discretion in approving the use of wiretaps.  <u>Becton</u>, 601 F.3d at 591 (citing <u>United States v. Sobamowo</u>, 892 F.2d 90, 93 (D.C. Cir. 1989)).  Second, the District Court, Judge Robertson, did not err in failing to hold a <u>Franks v. Delaware</u> hearing, because the information that defendant claimed was omitted from the affidavits was not material.  <u>Becton</u>, 601 F.3d at 591.  <u>Id.</u>  Third, the District court did not abuse is discretion in denying defendant's motion for a new trial, because it properly admitted the testimony concerning defendant's conduct during defendant's incarceration from 2003 to 2005 as direct evidence of the charged offense.  <u>Id.</u> (citing <u>United States v. Bowie</u>, 232 F.3d 923, 929 (D.C. Cir. 2000)).  Also, the Court of Appeals agreed with Judge Robertson's conclusion that the government's rebuttal remark about defendant's 1995-2000 incarceration was harmless.  <u>Becton</u>, 601 F.2d at 591.

<u>DEFENDANT'S CLAIMS</u>

<u>First</u>.  Under <u>Illinois v. Gates</u>, 462 U.S. 213 (1983), defendant states, "probable cause may be based on information provided by a confidential informant if it provides a[] substantial basis for" such a finding (§ 2255 Mot. at 7).  Because, defendant submits, the search warrant's supporting affidavit relied on reports of unnamed informants, it was required to include "some

information by which a neutral [m]agistrate c[ould] assess the credibility of these informants" (id. at 7, citing Gates, 462 U.S. at 227). Defendant complains (at 7) that the affiant here "ma[de] assertions of reliability of [the affiant's] informants but g[ave] no present examples of past profitable tips that the[y] ha[d] . . . . provided."

Defendant alleges (at 3, 8) that his attorney, Edward C. Sussman, Esq., failed to move to suppress the wiretap evidence on a probable cause theory under Gates, and thereby rendered ineffective assistance. And counsel ineffectively "fail[ed] to challenge the [g]overnment's use of [defendant's] past criminal record to [show] that probable cause existed to intercept a wire communication or that to search [defendant's] home w[ould] reveal evidence of a crime" (§ 2255 Mot. at 8-9).

Defendant concedes (at 3) that his attorney sought to suppress the evidence. Defendant argues, however, that counsel was ineffective because he proceeded on a "necessity" theory seeking a "Franks hearing," rather than by means of a "probable cause" challenge under Illinois v. Gates (§ 2255 Mot. at 3, 7-8).[5]

---

[5] Franks v. Delaware, 438 U.S. 154 (1978). Franks determined the circumstances in which it is appropriate to suppress evidence derived from a warrant issued on the basis of an affidavit containing false statements concerning probable cause. See United States v. Glover, 583 F. Supp. 2d 21, 33 (D.D.C. 2008) (quoting and discussing Franks). To obtain a Franks hearing, a defendant must make an adequately supported claim that the affidavit rests on statements either deliberately false or made with reckless disregard for the truth. United States v. Sobamowo, 892 F.2d 90,

Had counsel proceeded on a <u>Gates</u> theory, defendant claims, "the [g]overnment would have been faced with a formidable standard of review to meet its burden of proof beyond a reasonable doubt of every fact necessary to constitute the [charged] crime," and the outcome would have been different (§ 2255 Mot. at 6, 8-9). Defendant also suffered prejudice, he submits (at 8-9), when counsel allegedly failed to cite controlling law in his pretrial motion to suppress, and failed to challenge the government's use of his past criminal record to support a finding of probable cause. Counsel's allegedly deficient actions, defendant contends, caused defendant to fail to meet Rule 12(b)(3)'s deadline for filing timely objections (§ 2255 Mot. 9).

<u>Second</u>.  Defendant next argues (at 10-12) that counsel was ineffective when he allegedly failed timely to move for a judgment of acquittal at the close of the government's case, and to renew the motion at the close of all the evidence.  But for counsel's alleged failure to move to renew his MJOA, defendant claims, the District Court probably would have granted the motion because "the standard of review changes and the [c]ourt no longer looks at the evidence in light most favorable to the government" (§ 2255 Mot. 12).  Even if counsel were to argue that he made an MJOA at the

---

94 (D.C. Cir. 1989).  Also, <u>Franks</u> applies to wiretap affidavits submitted to satisfy the statutory "necessity" requirement of 18 U.S.C. §§ 2518(1)(c) and -(3)(c).  <u>United States v. Ippolito</u>, 774 F.2d 1482, 1485 (9th Cir. 1985).

13

close of the government's case, and again at the close of all the evidence, defendant contends, counsel was "still" deficient "because [he] merely made [c]onclusory statements . . ." (<u>id.</u> at 13). Also, defendant complains that counsel failed to submit any written MJOA, even though counsel allegedly said he would do so (<u>id.</u> at 15 (citing 9/24/08 Tr. 1029 ("I'll submit on it . . ."))).[6]

<u>Third</u>.  Next, defendant claims that counsel was ineffective for failure to object before and during trial under Rule 404(b), Fed R. Evid., to allegedly inadmissible evidence about defendant's shooting a man (rival drug dealer Russell Harris) in 2002, and smuggling and receiving drugs and other contraband (cell phone) between 2003 and 2005 while incarcerated (§ 2255 Mot. at 17 ("[c]ounsel failed to invoke Rule 404(b)"), 19-21 (citing Tr. Tr. 218-19, 394, 421-22 (shooting of Harris), 237-38 (drugs)).[7] Defendant acknowledges that certain pre-trial motions to suppress the government's evidence were filed by counsel, but complains (at

---

[6]     Also, defendant claims (at 15-16), without explanation, that defense counsel was ineffective for failing to argue, with respect to a number of counts, that the government had not met its burden under <u>In re Winship</u>, 397 U.S. 358, 364 (1970).

[7]     Defendant complains about testimony that he "shot a man in the ass," and other testimony that he shot a man "in the leg" (Mot. at 19-20, citing Tr. Tr. 218-19, 394, 422). The various pages of testimony to which defendant refers, however, concern only one shooting. <u>Compare</u> 9/16/08 Tr. (Tr. Tr.) at 218-19 (Christian Donaldson testifies that defendant told her that he "shot him [Russell Harris] in his ass") <u>with</u> 9/17/08 Tr. (Tr. Tr.) at 391, 394, 421-22 (Russell Harris testifies that defendant shot him in leg).

18) that he failed to renew those motions during trial and object under Rule 404(b).  In addition, defendant repeatedly complains that counsel should have moved for a mistrial, and sought a curative instruction, Rule 30(d), Fed. R. Crim. P., informing the jury that defendant could not be judged based on his character (§ 2255 Mot. 19-24).[8]

The evidence of other crimes or wrongs and bad character was extremely prejudicial, defendant complains.  The government "offered no direct evidence," defendant declares without foundation, presenting only "circumstantial evidence . . . as a means to inflame the jury by characterizing [defendant] as a violent criminal" (§ 2255 Mot. at 23, citing no support in the record).  The jury heard defendant described "as a ruthless violent person who shoots people when he feels like it" (§ 2255 Mot. 24).  Therefore, defendant argues (at 25), the Court cannot conclude "'with fair assurance; that the jury[']s verdict 'was not substantially swayed' by the improperly received 'other crimes, wrongs, or acts' evidence."[9]  Had counsel made specific objections

---

[8]    Although defendant had gone to trial and been acquitted of all charges in regard to the shooting of Russell Harris, defendant complains, counsel failed to cite any legal authority to challenge introduction of this evidence (§ 2255 Mot. 17, 24).

[9]    Defendant has confused his present, collateral attack with a direct appeal.  See United States v. Dewalt, 92 F.3d 1209, 1212-13 (D.C. Cir. 1996)(drawing distinction between harmless error standard on direct appeal and the fundamental defect standard on collateral review under § 2255).

under Rule 404(b), moved for a mistrial, and sought a curative instruction, defendant submits, there is a reasonable probability that the court would have granted the motion, and the outcome would have been different. (Id. 17, 23-24, 26.)

In addition, defendant complains that during opening statement counsel said that defendant "was a drug dealer, wasn't a nice guy, and that he was in prison," characterizing him "as a criminal" (§ 2255 Mot. 18-19, citing Tr. Tr. 33). Counsel's remarks allegedly denied defendant's Fifth Amendment rights to a fair trial, and opened the door to further such statements, by the government (§ 2255 Mot. 18).

Also, defendant alleges that counsel was ineffective in that counsel admitted to Judge Robertson (at 18) that he "was a Quitter" (citing 7/23/08 Tr. 38).

Finally, defendant raises a claim not based on the Sixth Amendment. He argues (at 24) that the Judge Robertson allowed "inadmisible testimony . . . based on [his] incarceration from 1995 to 1999." "Despite the fact that the evidence was suppressed," defendant complains, "the [g]overnment was still allowed to present it during its closing arguments." (§ 2255 Mot. at 24.)

Fourth. Also, defendant argues that counsel was ineffective for failure "to properly challenge the government's use of a prior felony conviction to enhance [defendant's] sentence under 21 U.S.C. §§ 841 and 851" (§ 2255 Mot. at 27). (Defendant was convicted of

attempted possession with intent to distribute cocaine in D.C. Superior Court in 1992.)

In particular, counsel failed to challenge this conviction under Rules 404(b), paragraph (4)("Certified Copies of Public Records") of Rule 902 ("Evidence That Is Self-Authenticating"), 802 ("The Rule Against Hearsay"), and, in essence, 402 (" . . . Irrelevant Evidence Inadmissible"), Fed. R. Evid. (§ 2255 Mot. 27-28).  Also, counsel was allegedly ineffective for, defendant complains, failing to contend that the government had not established that the person who incurred the earlier "enhancing" conviction was, in fact, defendant (id. at 29 (arguing that counsel should have argued absence of proof of "identity")).

Defendant concedes, however, that counsel argued that (1) "a set aside conviction must . . . be proven by appropriate evidence," (2) the "[g]overnment . . . never proffered a certified copy of any conviction," and (3) "'the [g]overnment . . . failed to meet the beyond-a-reasonable-doubt standard that's required . . . .'" (§ 2255 Mot. at 27-29 (quoting 1/30/09 Tr. at 12)).

Had counsel argued that the government could not prove the prior conviction and satisfy Rule 404(b) on the basis of identity, relevance, and foundation, defendant asserts (at 29), there was a "reasonable probability" that Judge Robertson would have granted such a motion.

17

Fifth.  Finally, defendant appears to claim that counsel was ineffective for allegedly failing to argue for a sentence below the guideline range, pursuant to United States v. Booker, 543 U.S. 220 (2005)(sentencing guidelines advisory only)(§ 2255 Mot. at 30). "Reasonabl[y] competent [c]ounsel would have argued for an advisory guideline under Booker to obtain a lesser sentence," defendant contends (id.). "Because a mandatory guideline has been held to violate the Sixth Amendment [, c]ounsel should've made a valid Booker objection to [defendant's] guideline range as calculated in the PSR," he adds (id.).

ARGUMENT

As shown below, all of defendant's claims are meritless and should be denied without a hearing.

A.   Defendant Has Not Met His Burden Of Establishing Ineffective Assistance of Counsel

1.   Legal Principles

The Supreme Court has established a two-part standard for evaluating claims of ineffective assistance of counsel. Strickland v. Washington, 466 U.S. 668 (1984). First, a defendant must show that his attorney's errors were "so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." Id. at 687. To meet this standard, a defendant must establish that "counsel's representation fell below an objective standard of reasonableness," i.e., "prevailing professional norms." Id. at 687-88. Further, trial counsel is presumed to have

18

performed competently, despite an unsuccessful outcome from a defendant's view. Strickland, 466 U.S. at 689. Reviewing courts must "'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" Nix v. Whiteside, 475 U.S. 157, 165 (1986) (quoting Strickland, 466 U.S. at 689). In analyzing this first prong, the reviewing court's assessment of counsel's performance must be comprehensive, rather than limited to a particular act or omission. Kimmelman v. Morrison, 477 U.S. 365, 386 (1986).

Second, a defendant must affirmatively prove prejudice that is "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687. To meet this standard here, defendant must show that "but for trial counsel's error there is a reasonable probability" that the result would have been different. Strickland, 466 U.S. at 694; United States v. Carr, 2006 WL 401818, *3-4 (D.D.C. Feb. 21, 2006). A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Failure to make the required showing on either prong defeats the claim. Id. at 700.

In addition, a district court need not conduct an evidentiary hearing to decide a § 2255 claim where "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief," or where the claims are "vague, conclusory, or palpably incredible," or raise factual matters capable of being

19

resolved on the existing record.  United States v. Pollard, 959 F.2d 1011, 1031 (D.C. 1992).

Finally, the "law of the case doctrine" refers to "a family of rules embodying the general concept that a court involved in later phases of a lawsuit should not re-open questions" already "decided . . . by that court or a higher one in earlier phases." Crocker v. Piedmont Aviation, Inc., 49 F.3d 735, 739 (D.C. Cir. 1995).  Thus, for example, issues that have been resolved on appeal may not be revisited thereafter in the same case; they are the law of the case.  Id.; see United States v. Alaw, 327 F.3d 1217, 1220 (D.C. Cir. 2003)(issues resolved on previous appeal should not be revisted on later trips to appellate court).

　　2.  Background

　　　　(a.)  Investigation

In 2001, the FBI began investigating drug trafficking in the 4200 and 4300 blocks of Fourth Street, S.E.  According to FBI Special Agent Mary Counts, defendant and his brother Willie Best led "a violent, narcotics trafficking organization" supplying large quantities of drugs (primarily cocaine, crack and marijuana) to their underlings, and overseeing the drug sales in that area (October 2005 Affidavit of Mary Counts).  Becton, 601 F.3d at 591. The government's investigation slowed after the last of a series of controlled purchases in June 2002, but "resumed in earnest in 2004" (Government's Omnibus Resp. to Def. James Becton's Pretrial Mots.

at 5-6, filed May 11, 2008 (Dkt. 180)).  The government, <u>inter</u> <u>alia</u>, seized crack cocaine from a car parked by Best and an associate in Washington, D.C.; obtained a pen register for the cell phone used by Frederick Mercer, a member of defendant's and Best's organization; executed a controlled buy using an informant; and recorded several phone conversations between Mercer and the informant.  <u>Becton</u>, 601 F.3d at 591.

On September 27, 2005, the FBI sought and obtained authorization to wiretap Mercer's cell phone.  Special Agent Counts submitted a 49-page affidavit ("Counts Sept. Aff.") seeking to intercept wire communications to and from this telephone by a number of persons believed to be conspirators, including defendant. This affidavit provided detailed information about defendant's and Best's operation as revealed by three confidential informants (S-1, S-2, and S-3) to protect the sources from retribution.  <u>Becton</u>, 601 F.3d at 591.

Counts stated her belief that "the interception of wire communications" was the "only available investigative technique . . . to establish the full scope and nature" of the conspiracy (Counts Sept. Aff.).  She averred that "[n]ormal investigative procedures" had been tried and "failed, appear[ed] reasonably unlikely to succeed if tried or continued, or [were] too dangerous to employ" (<u>id.</u>).  <u>Becton</u>, 601 F.3d at 591.

From the September 2005 wiretap of Mercer's phone, the FBI identified a cellular telephone number for defendant and obtained authorization to wiretap this phone from October 27, 2005 to November 25, 2005.  Thereafter, other wiretaps were approved and utilized.  After obtaining six wiretap authorizations, the FBI executed a series of search warrants on May 22, 2006 and May 23, 2007, of which the latter was the date of the case "take down." (Government's Notice of Intrinsic Evidence at 4 (Apr. 18, 2008).) Becton, 601 F.3d at 591.

> (b.) Pre-Trial

Fed. R. Evid. 404(b) & 403 / Intrinsic Evidence Issues

On December 20, 2007, defendant's attorney, Mr. Sussman, filed a Request for Notice of Government's Intention to Use Rule 404(b) Evidence at Trial (Dkt. 107).  Defendant, through counsel, asked Judge Robertson (at 1) to "order the government to provide notice of its intention to use at trial . . . any evidence which the government contends is admissible under [Fed. R. Evid.] 404(b)." Counsel noted (at 2) that the "introduction of 'similar acts' evidence m[ight] be extremely prejudicial to the defendant," and wanted the government to identify such evidence so that "the admissibility issue c[ould] be litigated prior to trial," and prevent "prejudicial surprise."

Defense counsel followed this up the next day with an In Limine Motion Regarding Introduction Of Evidence Concerning Overt

Acts One and Eighteen (Dkt. 115).  Overt Act Eighteen concerned the alleged shooting of Russell Harris by defendant in November 2002, a crime of which defendant had been acquitted in D.C. Superior Court (Limine Mot. at 2-3).[10]  Although "the evidentiary standard for admissibility "[wa]s, concededly, different than the standard for criminal conviction," counsel noted, this "event d[id] not survive the balancing test of [Federal Rule of Evidence] 403" and should not be admitted (id. at 3).

In response, on April 18, 2008, the government filed its Notice of Intrinsic Evidence (Dkt. 136), indicating (at 1) that it "intended to offer at trial" evidence "that [wa]s 'intrinsic' to the case."  The government intended to offer evidence of numerous uncharged acts, most of which fell outside the requirements of Rule 404(b) because it was "direct evidence of the conspiracy" (Notice at 1).  Among this was the evidence that in 2002, defendant opened fire on Russell Harris, who was selling crack that had not been supplied by the subject conspiracy (Notice at 8).

On May 30, 2008, the government filed an Omnibus Response to Defendant's Pretrial Motions (Dkt. 180).  With respect to defendant's request for notice of intent to use 404(b) evidence at trial, the government reiterated that "all of the evidence" at issue, other than certain certified convictions, was "direct proof

---

[10]    This appears to have been United States v. Becton, 2003 FEL 4036 (D.C. Super. Ct.), whose disposition according to the Courtview docket sheet was "Jury Trial Not Guilty").

of the conspiracy and thus f[ell] outside the requirements of Rule 404(b)" (Omnibus Resp. at 10).  "[P]roof of the [2002] shooting [of Harris] w[ould] be highly probative in establishing the existence of a conspiracy, its nature, and [defendant's] participation in it" (id. at 32).  At all events, the evidence passed Rule 403's balancing test and was not unduly prejudicial (id. at 32).[11]

At a June 11, 2008 hearing, defense counsel contended that the government was wrongly trying to use information concerning a 1992 D.C. Superior Court conviction for attempted PWID that had been set aside.  Because it predated the beginning of the charged conspiracy by three years, it "f[ell] way outside . . . [its] bounds," and should be excluded under Fed. R. Evid. 404(b)(6/11/08 Tr. at 22, 24, 26-27).  Counsel also submitted that the judge should not allow into evidence Overt Act 18 (concerning defendant's shooting Russell Harris in the buttocks) because to do so would take an "unnecessarily long" time, and "divert from the true matters" at issue (id. at 28-29).

Thereafter, at a hearing on July 23, 2008, defense counsel argued that evidence about Overt Act 18 should not be admitted, citing relevance, "trial within a trial," and prejudice issues.  "The[ government is] . . . obviously trying to intrude a violent

---

[11]    The government agreed that defendant had been found not guilty in D.C. Superior Court of the charges arising out of this 2002 shooting, indicating that this acquittal did not impede the introduction of "proof of the incident during his federal narcotics conspiracy trial." Omnibus Resp. at 30.

act for which [defendant] has already been acquitted," argued Mr. Sussman. (7/23/08 Tr. 37-38.)[12] The government countered that this shooting of a rival dealer on the conspiracy's own territory was "conduct in furtherance of the [charged] drug-trafficking conspiracy, perpetrated by the alleged leader of the conspiracy" (7/23/08 Tr. 39-40). In particular, the government proffered that a witness would testify that defendant said he shot the man because the man was selling on defendant's turf (id. at 40). Judge Robertson replied, "That's enough for me. The motion in limine will be denied as to overt act number 18." (Id. at 40-41.)

On September 4, 2008, defense counsel filed an Amended Opposition to Government's Proposed Introduction Of Evidence Alleged To Be Intrinsic To Conspiracy (Dkt 213). Thereby, defendant expressly challenged (at 1), under Rules 403 and 404, Fed. R. Evid., the government's intended use of "evidence that it proposes [to be] intrinsic to the conspiracy" (Amended Opp. at 1-2 (emphasis omitted)). Counsel argued against the introduction of evidence concerning "a series of events that occurred between 1995 and 2007 while [defendant] was incarcerated" (id. at 5). Also, the

_____

[12]    Mr. Sussman added, "Remember I said . . the government doesn't give up? Even after the suppression order they were still trying to find a theory or something like that." In a wry compliment, Judge Robertson replied, "Whereas you, Mr. Sussman, are a quitter?" Continuing the friendly exchange, Mr. Sussman (ironically) responded, "I quit. That's right. That's been my style for a long time." (7/23/08 Tr. 38.) Mr. Sussman meant, of course, that he was anything but a "quitter."

defense objected to the use of any evidence concerning events occurring before 1995, when the alleged conspiracy began (id. at 3).   On September 8, 2008, the government filed its Reply To [Defendant's] Amended Opposition To Government's Notice Of Intrinsic Evidence (Dkt. 221).   It proffered that evidence concerning the defendant's incarceration beginning in 2003 was "inextricably intertwined" with the other evidence to be presented at trial (Govt's Reply at 5).   "Witnesses w[ould] testify [that] during his incarceration, [defendant] continued to direct the drug trafficking activities of co-conspirators," the government stated. "[W]hile incarcerated, defendant directed one co-conspirator to supply another with a quantity of heroin, so that [it] could be delivered to the defendant in prison for further distribution." (Id.)   There would "also be testimony," the government stated, that "defendant enlisted the aid of a correctional officer at the federal prison . . . to smuggle in contraband, including a cellular telephone, so that [he] could . . . direct . . . events while incarcerated."  (Id.)

   On September 9, 2008, the defense argued that the court should not hear historical evidence of defendant's drug activity earlier than 1995.  Judge Robertson indicated that he was inclined to agree (9/9/08 Tr. at 12-22.)

   Also, Judge Robertson considered the defense's request that evidence of defendant's actions while he was incarcerated from 2003

to 2005 should be excluded. The government argued that the evidence was admissible because it concerned acts "in furtherance of the conspiracy" (9/9/08 Tr. 28). The defense countered that it would be prejudicial to allow evidence concerning the fact of defendant's incarceration (id. at 29-30). Judge Robertson indicated that he favored admission of the evidence but would ultimately decide at trial, inviting the defense to suggest an appropriate limiting instruction (9/9/08 Tr. 31). For tactical reasons, the defense declined to offer a limiting instruction. See government's December 12, 2008 Opposition to Motion for New trial (Dkt. 294) at 4; Declaration of Edward C. Sussman, Esq. ("Sussman Decl.") ¶ 6.

### Motion To Suppress Wiretap Evidence

Meanwhile, on April 28, 2008, co-defendant Willie Best filed a 16-page, well-supported Motion to Suppress Evidence Obtained From Wiretap Surveillance ("Best Mot." (Dkt. 150)), attacking the various affidavits signed by Special Agent Counts. He sought to suppress evidence from the six 30-day periods of wiretap surveillance authorized on September 27, 2005 (Mercer's phone); October 27, 2005 (defendant's phone); December 16, 2005 (second wiretap of Mercer's phone); January 27, 2006 (Best's phone); February 24, 2006 (second wiretap of Best's phone); and April 4, 2006 (three additional phones used by defendant).

Citing ample case authority, Best submitted that he had standing as an "aggrieved person" under 18 U.S.C. § 2518(10)(a) & (11) to move to suppress evidence derived from electronic surveillance, regardless of the particular phone number intercepted (Best Mot. 2-5). Best argued that the various orders approving the wiretaps were not supported by probable cause (Best. Mot. at 7-9). Best explained that it was necessary to make such a probable cause assessment using the totality-of-the-circumstances test to determine whether there was a "fair probability that evidence of a crime w[ould] be found" (Best's Mot. at 7 (citing United States v. Errera, 616 F. Supp. 1145, 1149 (D. Md. 1985), citing Illinois v. Gates, 462 U.S. 213 (1983)). Best argued (at 9) that there were "few particularized facts establishing probable cause of his involvement in any drug distribution conspiracy, other than statements of informants and cooperating witnesses who, . . . were known to be unreliable despite assertions otherwise." For this and other reasons, the "affidavit fail[ed] the 'totality of the circumstances' test to determine whether or not, under all the circumstances, there is a 'fair probability that evidence of a crime will be found.'" (Best Mot. at 9 (citing Illinois v. Gates).)

On July 6, 2008, defendant filed a seven-page Supplemental Memorandum In Support Of The Motion To Suppress The Use Of Wiretap

Interceptions, which adopted and supported Best's Motion to Suppress. (Suppl. Mem. (Dkt. 192) at 1-2.)

This memorandum explained that "in an effort to share responsibilities in this case, the filing and litigation of 'the wiretap motion' was undertaken by counsel for Willie Best" (Supp. Mem. at 1). "Recent developments," however, "ha[d] apparently made the original plan unworkable," so defendant Becton asked that Judge Robertson "receive [his] supplemental memorandum on the issue" (id.).[13]

In addition to adopting and supporting Best's motion to suppress, defendant Becton "independently claim[ed] that the [subject] wiretaps were deficient" under the relevant statute "because the government failed to exhaust customary law enforcement methods before initiating this *exceptional* means of investigation" (Suppl. Mem. at 2 (emphasis in original)). Defendant argued that "such [government] intrusion is . . . to be . . . a last resort; utilized only after all conventional law enforcement techniques have been exhausted and proved unsuccessful." (Suppl. Mem. at 2-3 (citing United States v. Giordano, 416 U.S. 505, 515 (1974)).) See Becton, 601 F.3d at 593 (emphasis added)(Becton "filed a supplemental motion in support of Best's motion to suppress electronic evidence"; he "adopt[ed] Best's [suppression]

---

[13]    On July 2, 2008, Willie Best pleaded guilty to Count One (conspiracy).

arguments," and elaborat[ed] on the necessity argument"). Defendant Becton developed this "necessity" argument over the course of five pages, citing Supreme Court and various circuit authority.

At a hearing on July 23, 2008, Judge Robertson considered the defendants' motions to suppress the wiretap evidence, confirming that "the defendants have joined" co-defendant Best's April 28, 2008 motion to suppress wiretap evidence (7/23/08 Tr. at 2 (referencing "the motion of co-defendant Best").

Judge Robertson told Mr. Sussman that "the affidavit by Agent Counts seem[ed] to include a lot of detail about why the wiretap was appropriate . . . ." Mr. Sussman replied that "the Court's analysis . . . ha[d] to go . . . farther, and particularly when the allegations that were made by [Willie Best], as well as by me in the supplemental filings, indicate[] that material information was withheld from . . . Judge Kollar-Kotelly." (7/23/08 Tr. 3.) Mr. Sussman confirmed that he had "adopted" Willie Best's motion to suppress wiretap evidence (7/23/08 Tr. 3)(referring to "Mr. Seligman['s (counsel for Willie Best)] . . . prior filing").

With respect to his Illinois v. Gates argument, Mr. Sussman noted that "the government would concede that there were things left out of [the first] affidavit concerning the reliability of a couple of the sources" (7/23/08 Tr. at 4). Mr. Sussman contended that "the government made material omissions in its filing designed

to convince the judge to authorized the wiretap" (id. at 6).
"[H]ad the government given the true state of the investigation .
. . as of September of 2005," argued Mr. Sussman, "Judge Kotelly
might well have made a very different decision" (id. at 10).

Judge Robertson denied the motion to suppress (7/23/08 Tr. 17;
7/23/08 Tr. Minute Entry, "Motion to Suppress Evidence gained
through the Wiretap by James Becton; DENIED").  The defense was
successful, however, in convincing Judge Robertson that defendant's
1992 D.C. attempted PWID conviction could not be put into evidence
at trial.  See 7/23/08 Tr. 24-28; Docket for July 23, 2008 (minute
order).

Enhancement

Meanwhile, on April 18, 2008, the government filed an
information as to prior convictions, giving notice that defendant,
having been convicted of attempted possession with intent to
distribute cocaine in case number F-3580-92 in D.C. Superior Court,
was subject to the enhanced penalty provisions of 21 U.S.C. §
841(b)(1)(A).[14]

On April 30, 2008, defendant filed his response to the
government's notice of enhanced penalties (Dkt. 155), noting that
the government had not submitted a certified copy of the 1992

---

[14]   This section provided in pertinent part that "if any
person commits [a violation of this section] after a prior
conviction for which a felony drug offense has become final, such
person shall be sentenced to a term of imprisonment which may not
be less than 20 years and not more than life imprisonment . . . ."

conviction.  The records for the conviction could not be found in the Criminal Records section of the Superior Court, and did not appear on the court's data base.   The defense proffered that defendant was sentenced to probation under the D.C. Youth Rehabilitation Act, D.C. Code § 24-806, which provided for a "set aside" if probation was successfully completed.   Under these circumstances, argued the defense, the conviction could not be used to enhance the new charge.  Defense counsel argued the matter at a motions hearing in June 2008 (6/11/08 Tr. 32-33).

Trial

The government's opening statement on September 15, 2008, 2008, detailed an array of evidence showing that defendant was a drug kingpin who had been engaged in a major conspiracy to market cocaine on the streets of Washington, D.C. (9/15/08 Tr. 3-28 ("they developed a virtual monopoly"; defendant "became quite successful in the drug game"; he drove a $50,000 BMW and started to "refer[] to himself as P-Diddy, with the keys to the city").)

To establish credibility with the jury in hopes of enhancing the prospect of a favorable verdict, defense counsel conceded that defendant was a small time hustler, suspicious and tough, a product of the streets (Sussman Decl. ¶ 4).  But defendant was no kingpin and no conspirator, and in any event, only one of about 16 people charged:

> [T]he government has charged some 16 or 17 people with
> operating a conspiracy.  It's not just Mr. [James] Becton

and Mr. [Christopher] Becton; the government has indicted
16 people or more, charged other people with being part
of the conspiracy as unindicted co-conspirators.

* * *

We have no duty nor are we going to try to prove that
James Becton is any candidate for citizen of the year.
That's not what we're here to do.  The evidence is going
to show that he's a small time hustler, a product of the
streets, suspicious, tough, maybe rough around the edges,
maybe not the nicest guy when it comes to his romantic
relationships, a guy who will maybe hustle some drugs,
sell you Viagara [or] . . . bootleg liquor.  He gets
arrested, he gets out, he gets a job sometimes, . . . a
real job, he gets out.  That's what he is.  *He is not the
kingpin . . . of the 4*$^{th}$ *Street area*.  He's a guy doing
business, and *like everyone who does business in
anything, you deal with other people.  That doesn't mean
you conspire with them*, it means you've got to deal with
other people.  You talk to them.
. . . .

People would come, people would go; just as buyers would
go, sellers would go.  It was a life of constantly
changing, shifting relationships, nothing that would be
concise, concrete enough to define as the conspiracy the
government has charged here.  And you'll find at the end
that the conspiracy is not what these [defendants]
created  . . . , but what these [prosecutors] created .
. . .

(9/15/08 Tr. 29, 33-34 (emphasis added); see Sussman Decl.  ¶ 4.)

On the morning of September 16, 2008, Mr. Sussman reminded

Judge Robertson that he had not yet resolved the issue whether the

government would be allowed to adduce evidence concerning

defendant's activity while he was incarcerated from 2003-2005

(obtaining a cell phone and heroin).  The government renewed its

proffer in this respect, and Mr. Sussman objected on two grounds:

relevance and prejudice.  The judge concluded that the evidence was

not "intrinsically inflammatory," and overruled the defense objections without prejudice (9/16/08 Tr. 81-86).

Thereafter, near the end of the day on September 23, 2008, the government told Judge Robertson during a recess that it was almost finished with its case in chief.  Counsel for Christopher Becton, James Rudasill, Esq., then told Judge Robertson that he would be calling one witness, and the judge inquired of defendant Becton's counsel, Mr. Sussman, "[W]hat's going to happen on your side?"  Mr. Sussman indicated that he would not be putting on any evidence. The judge said, "look, we'll take the Rule 29 motion as – you can argue it after the jury goes home if you want to."  The judge then said to Mr. Rudasill, "We'll just go straight to your witness . . . ."  (9/23/08 Tr. 973.)

Thus, Judge Roberston was letting defense counsel know that, in the interests of efficiency, he would hear both of their MJOAs after all the evidence was adduced -- "after the jury goes home" -- so as not to take up the jury's time with the initial MJOA, which would, of course, ordinarily be heard at the close of the government's case.  To clarify, Mr. Sussman said, "Just so I understand the Court, the Court is assuming that the motion is made at the close of [the] government's evidence?"  Judge Robertson replied, "Yes, I'm assuming that it's made at the close of the government's evidence, and I'll hear it after the jury goes home." (9/23/08 Tr. 974.)

Accordingly, immediately after the penultimate government witness testified, co-defendant Christopher Becton's witness, Gregory Leonard, took the stand, and was followed by the last government witness. Then, the government rested (9/23/08 Tr. 1022). With the jury still present, Judge Robertson then inquired whether either of the defendants had anything further, and Mr. Sussman, in keeping with Judge Robertson's prior directive, announced that he would rest, making no MJOA at that time:

> Court: I asked if either of the defendants have anything further.

> Mr. Sussman: No. We had previously moved in Defense Exhibit 1 in the government's case. We have no further testimony or evidence. We rest.

(9/23/08 Tr. 1022.) The judge told the jury that they had heard all the evidence in the case, that they would hear closing arguments the next day, and sent them home at 4:29 p.m. Judge Robertson then said, "[C]ounsel, let's take five and then we're going to come back and talk about jury instructions." (Id. at 1023-24.)

Before Judge Robertson left the bench, government counsel asked if there could be an on the record inquiry by the judge with respect to the defendant's and co-defendant's decision as to whether to testify. Judge Robertson agreed to do so and complimented both defense counsel:

> I think it's *pretty clear that* [both defendants are] *well counseled* and that they've made a well counseled decision . . . .

35

(9/23/08 Tr. 1024 (emphasis added).)

The next morning, the judge explained that there had been "an instruction conference in chambers last night," which was "continued . . . informally this morning," all of which evidently had been off the record.  Mr. Sussman then made both of his MJOAs on behalf of James Becton, which Judge Robertson deemed made as made as of the appropriate times, and denied:

> Mr. Sussman:  I just want to preserve the record in terms of moving for the judgment of acquittal at the close of all evidence, as well as the prior MJOA motion I had made at the close of the government's case, just so the record is clear.  I'll submit on it and . . .

> Court:  All right.  The MJOA motions of both defendants are deemed made at the close of the government's case-in-chief and before the testimony of Mr. Leonard, or without considering the testimony of Mr. Leonard, and they are denied.  And unless either party wants to argue it more fully, they are also deemed made at the close of all the evidence, and also denied.

(9/24/08 Tr. 1028-29.)

Thereafter, in the defense summation, Mr. Sussman suggested that the government had little or no evidence of drug activity by defendant between 1995 and 2001:

> [D]oes anyone on this jury recall any evidence whatsoever of what happened in the [Fourth Street] courts [viz., the place where the drugs were sold] between 1995 and 2001? That's six years.  The only evidence you heard about that period of time was that sometime in 1995, Chris Becton got arrested because he had drugs in his pocket, and somehow those drugs, according to the government are James Becton's drugs.

(9/24/08 Tr. 1076-77.)  When the defense summations were concluded, the prosecutor asked permission at the bench to argue that

36

defendant had been incarcerated from mid-1995 until 1999.  Over the defense objection, Judge Robertson told the government it could do so.  (9/24/08 Tr. 1099-1100.)   Accordingly, over objection, the government responded in pertinent part in rebuttal:

> Mr. Sussman argued to you an absence of evidence about the conspiracy in 1995 up through 2001, when Christian Donaldson move[d] into the second court.  It is a fact, . . . that James Becton was not on the street from about midway through 1995 until sometime towards the end of 1999.  He was not on the street.  That is a fact.  He was incarcerated.

(9/24/08 Tr. 1114.)

Post-Trial

On January 28, 2009, defendant filed a sentencing memorandum, arguing that the government had not proven beyond a reasonable doubt the 1992 D.C. conviction for attempted PWID (Defendant's Sent. Mem. (Dkt. 317) at 1-3 (citing United States v. Law, 528 F.3d 888 (D.C. Cir. 2008) and United States v. Luna, 768 F. Supp. 705 (N.D. Cal. 1991)).   The defense submitted (at 2) that "the government has . . . not established a past narcotics conviction by the necessary evidentiary standard[,] and the [sentencing] enhancement is invalid."

The defense contended (at 6-7) that while defendant could be facing as much as a 20-year mandatory minimum, this "should be an absolute maximum," and an "even lower sentence" should be considered.  Further, urging the District Court to avoid sentencing disparities, the defense noted that "Willie Best, a purported

organizer of the conspiracy, received [a sentence of] 13 years [of incarceration]; far less than his guidelines calculation."  And Keith S**a**mpler, "a purported lieutenant," received a ten year sentence that was to run concurrently with others, reflecting "a significant departure from the guidelines." (Sent. Mem. at 8-9.)

The next day, the government filed its sentencing memorandum (Dkt. 320), arguing (at 18) that defendant was "deserving of the highest sentence allowed by law": life in prison.  The government described (at 1-17) defendant's history as a violent drug dealer, beginning well before 1995, the details of the extensive drug conspiracy on which defendant was convicted, including the shooting of Russell Harris (on which he had been previously acquitted) and the recovery of multiple weapons from his home, an analysis of the factors under 18 U.S.C. 3553, and his criminal history, including two arrests at age 17 for PWID cocaine, and one arrest at 18 for possession of a prohibited weapon, and his April 1993 sentence upon conviction for attempted possession with intent to distribute cocaine.

The judge raised the pending issue of "the [1992 D.C.] youth felony drug conviction [for attempted PWID] and what that means to [defendant's] criminal history points" (1/30/09 Tr. 4-5).  The government pointed to a certified copy of the set-aside order, signed by the Honorable Frederick H. Weisberg, stating that defendant "was convicted of attempted [PWID] cocaine on 11/12/92,

38

and sentenced on 4/12/93." (1/30/09 Tr. 10, 5.) The government offered its case jacket from 1992 memorializing "the proceedings that reflect the plea and the conviction and the sentencing." The government also proffered testimony from an employee of the Superior Court's Special Proceedings Branch. The Branch had a certified copy of Judge Weisberg's set-aside order, bearing defendant's own, unique PDID number: 445-559. The prosecutor also suggested that Judge Robertson take judicial notice of defendant's records, "and confirm that that's the same PDID number. . . ." The government also noted that defendant had a case in 2004 in Superior Court in which the probation officer listed the 1992 conviction as a felony conviction in the presentence report. (1/30/09 Tr. 5-10.)

The defense responded that the government had not proved the conviction beyond a reasonable doubt, citing Law, 528 F.3d 888, with respect to the standard of proof. The Superior Court still did not "have the record" even after 17 months, because of "faulty record keeping . . . ." Counsel noted that the conviction had not been "acknowledged as true by [defendant]," and that "the probation office . . . did not afford [defendant] any . . . points for this conviction because by their own standards the proof was insufficient." (1/30/09 Tr. 10-12.)

On February 5, 2009, Judge Robertson ruled that the government had proven beyond a reasonable doubt defendant's 1992 Superior

39

Court conviction for attempted PWID(2/5/09 Tr. 2-3)(citing Judge Weisberg's set aside order).  That conviction made defendant's criminal history rating a category five rather than a category four, because "the law is very clear that even a conviction expunged under the Youth Corrections Act will be considered as part of the criminal history under the guidelines" (2/5/09 Tr. 3).

Defendant's resulting offense level was 36 so that, with a category five criminal history, his guidelines range was between 292 and 365 months (2/5/09 Tr. 4-5).  The government argued for a life sentence (id. at 9-12).  Mr. Sussman countered that defendant was "just one more small time drug dealer who carved out a small niche on the courts on 4th Street."  "Someone not dissimilar from him probably had the same . . . niche on 6th Street; someone else had the same niche" elsewhere.  (Id. at 13.)  Counsel urged Judge Robertson to choose a sentence "significantly below the guidelines" that would still "provide any necessary rehabilitation and . . . serve the interests of justice."  (Id. at 14 (emphasis added).)

Defense counsel noted that the sentence for Willie Best was "substantially less than what the government [wa]s asking for" for defendant (2/5/09 Tr. 15).  Counsel argued for "a sentence admittedly above that [for Mr. Best, who pleaded guilty] *but below the lower range of the guidelines* . . . ."  "[A]ll the statutory purposes would be served with a sentence that would be *well below*

*the bottom level of the guidelines.*"   (<u>Id.</u> at 15-16 (emphasis added).)

### Motion For New Trial

Meanwhile, on October 16, 2008 (Dkt. 250), defendant filed a motion for a new trial and memorandum in support ("MNT").   It focused on the testimony concerning defendant's actions during his 2003 - 2005 incarceration:   "allegations that [defendant] used a cell phone that was smuggled into a correctional . . . facility and . . . was engaged in heroin trafficking while incarcerated" (MNT at 2).   Defendant argued that these acts were irrelevant to the conspiracy charge, and that they should have been excluded under Rules 404(b), Fed. R. Evid., and as unduly prejudicial.   Defendant also argued that the court had erred in permitting the prosecution to refer to his 1995-1999 incarceration in rebuttal.   On December 12, 2008, the government opposed defendant's motion for a new trial.

On January 30, 2009, Judge Robertson declared that he was going to deny the motion for new trial, and was working on a draft opinion.   As to evidence of defendant's conduct during his 2003-2005 incarceration, Judge Roberston indicated (at 2) that it was "intrinsic to evidence of the conspiracy and [wa]s not therefore [Rule] 404 evidence."   With respect to the remark in the government's rebuttal argument that defendant had been incarcerated between 1995 and 1999 (made with the judge's permission), Judge

41

Robertson conceded error, but was inclined to find it harmless "because *the evidence of [defendant's] guilt was so overwhelming*." (1/30/09 Tr. 2-3 (emphasis added).)

On February 11, 2009, Judge Robertson denied the motion for a new trial. Defendant's "receipt of the contraband while in prison [wa]s intrinsic to the charged offense . . . ." (Mem. Order at 1.) Thus, the challenged evidence had been admitted properly as relevant evidence, and was not Rule 404(b) evidence:

> The testimony about [defendant's] activities while incarcerated was relevant to the existence and/or continuing operation of the charged conspiracy and probative of Becton's participation in it. . . .
>
> *This was not Rule 404(b) evidence; it was evidence intrinsic of the conspiracy. . . .*

(Mem. Order at 6 (emphasis added).) In addition, admission of the evidence did not offend Fed. R. Evid. 403:

> The probative value of introducing this evidence was not "substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403, see U.S. v. Champion, 813 F.2d 1154, 1172 (11th Cir. 1987).

(Id. at 7.)

Also, Judge Robertson denied the claim concerning his allowing the government to refer to defendant's 1995-99 incarceration in rebuttal. The judge found that the government had not alluded at trial to defendant's absence during his 1995-1999 incarceration, but, during closing argument, the defense had made reference to the absence of evidence concerning that time period. (Mem. Order at 7-8, citing 9/24/08 Tr. 1077.) Nevertheless, Judge Robertson found

42

that he "should not have allowed the prosecution to make the contested statement in rebuttal because it was unsupported by record evidence" (Mem. Order at 10).   That error, however, was harmless "given the context of the rebuttal as a whole" and "because the prosecution did not mention why defendant was incarcerated or where, and the jury had already properly heard that defendant had remained involved in the conspiracy during his 2003-2005 time in jail" (id. at 10-11).

Also, Judge Robertson found that "*this was not a close case; the evidence against defendant was unambiguous and overwhelming*" (Mem. Order at 11)(emphasis added).   Further, "the prosecution's evidence and argument focused almost exclusively on events that occurred after [defendant] was released" from his 1995-99 incarceration (id.).   Thus, "[t]he error was 'a single misstatement confined to a closing argument' . . . [made] just after the prosecution rightfully informed the jury that the government need not prove the conspiracy began or ended on the dates set forth in the indictment, or that it lasted for any particular length of time." (Id. (quoting United States v. Gartmon, 146 F.3d 1015, 1026 (D.C. 1998)).)

The D.C. Circuit affirmed the denial of the new trial motion:

> The District Court correctly held that [evidence pertaining to [defendant's] conduct while incarcerated from 2003 to 2005] was not Rule 404(b) evidence.

Becton, 601 F.3d at 598 (internal quotations omitted). "[T]he evidence that Becton continued to manage the drug operation on Fourth Street, S.E., while incarcerated constituted direct evidence of his continuing participation in the charged conspiracy and *[wa]s therefore 'properly considered intrinsic' evidence outside the scope of Rule 404(b)*." Id. (emphasis added, quoting Bowie, 232 F.3d at 929).

   3.   Discussion

      (a).   Defendant Has Failed To Show Constitutional Prejudice

Even assuming arguendo that counsel's representation was deficient, defendant has not met his burden of showing Strickland prejudice because "the evidence against defendant was unambiguous and overwhelming" (Feb. 11, 2009 Mem. Order at 11; 1/30/09 Tr. 2-3)("evidence . . . so overwhelming").[15] See Wilkinson v. Walls, 42 Fed. Appx. 864, 867 (7th Cir. July 25, 2002)(given overwhelming evidence of guilt, defendant failed to show he was prejudiced by alleged deficient representation); United States v. Skinner, 796 F.

_____

[15]   Judge Robertson's considered view was echoed by the D.C. Circuit:

> *[T]his case was not close*: [defendant's] participation in the conspiracy was established by numerous witnesses and by intercepted conversations in which the jury heard [defendant] repeatedly directing the supply and distribution of narcotics.

Becton, 601 F.3d at 599 (emphasis added).

Supp. 31, 35 (D.D.C. 1991)(even if counsel's representation deficient, no prejudice in light of overwhelming weight of evidence), aff'd on other grounds, 10 F.3d 13 (D.C. Cir. 1993); Lang v. United States, 2009 WL 4788430, *2 & n.16 (S.D.N.Y. 2009)(citing Strouse v. Leonardo, 928 F.2d 548, 556 (2d Cir. 1991) for proposition that court "declin[ed] to address . . . alleged ineffectiveness given . . . overwhelming evidence of guilt at trial")); Thompson v. Bradshaw, 2007 WL 2080454, *15 (N.D. Ohio Jul. 16, 2007) (citing Keller v. Bagley, 81 Fed. Appx. 527, 530 (6th Cir. 2003), for proposition that defendant could not establish prejudice for ineffectiveness claim where evidence ample if not overwhelming).[16]

> (b). Defendant Has Failed To Show
>      Constitutionally Deficient

At all events, as the record shows, defendant has failed to demonstrate Strickland deficiency with respect to any of his claims.

---

[16]     Because defendant must prevail on both of Strickland's prongs in order to gain relief, the Court may dispose of the ineffectiveness claims for the failure to show constitutional prejudice, alone, without engaging in any further analysis. Strickland, 466 U.S. at 697 (failure to make required showing on either prong defeats ineffectiveness claim).

> > (1.) Defendant Has Not Shown
> > Ineffective Assistance as
> > to Alleged Failure to
> > Move to Suppress Wiretap
> > Evidence on an <u>Illinois
> > v. Gates</u> Probable Cause
> > Theory (First Claim, pp.
> > 3-9.

Defendant's ineffectiveness allegation based on counsel's claimed failure to move to suppress the wiretap evidence on an <u>Illinois v. Gates</u> probable-cause theory is without foundation. After co-defendant Willie Best filed a motion explicitly seeking relief on that very theory, Mr. Sussman expressly adopted and supported it, on defendant's behalf, in his Supplemental Memorandum, which also argued an additional theory under <u>Franks v. Delaware</u> (Dkt. 150). <u>See</u> <u>supra</u>, pp. 27-31 (<u>citing</u> <u>Becton</u>, 601 F.3d at 593; Dkt. 150; Dkt. 192; 7/23/08 Tr. 2-4, 6, 10, 16). Defendant's claim thus fails for want of a premise. <u>See</u> <u>Griffin v. United States</u>, 204 Fed. Appx. 792, *3 (11th Cir. 2006)(counsel "adopt[ed] the arguments of the co-defendants which included this [drug-quantities] issue, thereby raising [it] on appeal"; rejecting claim that appellate counsel was ineffective for failure to raise drug-quantities issue on appeal).[17]

---

[17]    Defendant's passing complaint that counsel's allegedly deficient actions caused defendant to fail to meet Rule 12(b)(3)'s deadline for filing (unidentified) timely objections (§ 2255 Mot. 9) is void for vagueness, and without merit in any event because Judge Robertson considered Mr. Sussman's objections on the merits. <u>See</u> <u>United States v. Pollard</u>, 959 F.2d 1011, 1030-31 (D.C. 1992); <u>see</u> <u>also</u> <u>United States v. Moreland</u>, 175 F.3d 1021, *6 (7th Cir. 1999).

Equally meritless is the defendant's assertion (at 5, 9) that his attorney's suppression memorandum in this regard lacked citation to "controlling case law."  See <u>supra</u>, pp. 27-30 (citing Dkt. Nos. 192, 150).  Also untenable is defendant's complaint (at 8-9) that counsel was ineffective for "failure to challenge the . . . use of [defendant's] . . . criminal record" in support of probable cause.  See <u>United States v. Wagner</u>, 989 F.2d 69, 73 (2d Cir. 1993)(prior convictions relevant consideration in determining probable cause); <u>United States v. Majeed</u>, 2009 WL 2393439, *7 (E.D. Pa. 2009)("the affidavit also reported on the extensive drug-related criminal histories of . . . Majeed"; "[s]uch criminal records are relevant to a determination of probable cause"); <u>see also United States v. Sayan</u>, 968 F.2d 55, 65 (D.C. Cir. 1992)("A lawyer is not ineffective when he fails to file a meritless motion")(internal quotations omitted).[18]

> (2.) Defendant Has Not Shown Ineffective Assistance as to Alleged Failure to Timely Make MJOAs (Second Claim, pp. 10-16).

Defendant's claim that counsel was ineffective for failure to make timely MJOAs also is without foundation.  As shown, <u>supra</u>, pp. 34-37, counsel made both MJOA motions on a "nunc pro tunc" basis, at the time directed by Judge Robertson, who shifted the normal

---

[18]   Defendant also has failed to show constitutional prejudice in this regard.

order of events in the interests of efficiency.  Judge Robertson deemed them filed as of the regular time, and denied them (9/24/08 Tr. 1029).  On this record, there was no faulty representation here.

Further, defendant's claims that counsel merely "made conclusory statements in his MJOA which did nothing but challenge the quality of the government's evidence based on factual findings," and should have put them in writing (§ 2255 Mot. at 13) is void for vagueness, see United States v. Goss, 646 F. Supp. 2d 137, 143-44 (D.D.C. 2009)("vague allegation" of ineffectiveness offered no information that "could lead the court to believe that . . . attorneys' conduct fell below an objective standard of reasonableness"), and otherwise insupportable.  It was well within the standard of care for counsel to make a brief oral MJOA particularly where, as here, the evidence against defendant was overwhelming.  Defendant has failed to overcome the strong presumption that counsel's advocacy was within the wide range of constitutionally sufficient representation.  See United States v. Henry, 821 F. Supp. 2d 249, 257 (D.D.C. 2011)(vague complaints insufficient to overcome strong presumption that counsel's representation adequate and reasonable); cf. Flamer v. State, 585 A.2d 736, 757 (Del. Super. 1990)(failure to give longer, more

detailed opening statement and closing argument not ineffective assistance).[19]

Finally, at all events, defendant has failed to demonstrate that he has suffered constitutional prejudice in connection with any of the allegations he makes in Claim Two. Indeed, Judge Robertson, on the record, "deemed" both MJOAs to have been at the usual time (9/24/08 Tr. 1029). See Goss, 646 F. Supp. 2d at 143 (defendant offered no evidence to show reasonable probability that but for alleged unprofessional errors, result of criminal proceeding would be different).

> (3.) Defendant Has Not Shown Ineffectiveness as to Alleged Failure to Properly Object to Evidence Concerning His Shooting a Rival Dealer in the Buttocks in 2002, and His Conduct During 2003-2005 Incarceration (Third Claim, pp. 17-26).

Next, defendant complains that counsel was ineffective for failure properly to object, under Rule 404(b), Fed. R. Evid., to

---

[19]    Defendant's complaint (at 15) that counsel failed to file a written MJOA, even though counsel allegedly "stated on the record that he would submit" one, is without foundation. Counsel said no such thing. See 9/24/08 Tr. 1029 (defense counsel says he will "submit on it"). Further, defendant's unadorned claim (at 15-16) that counsel was ineffective for failure to argue that the government did not meet its burden under In re Winship is void for vagueness, see footnote 6, supra. See Pollard v. Armontrout, 16 F.3d 295, 297-98 (8th Cir. 1994)(denying vague ineffective assistance claims); Medina-Sanchez v. United States, 2009 WL 921162, *2 (D.P.R. 2009)(same).

evidence that (1) he shot Russell Harris in the buttocks (in 2002), and (2) he received contraband including drugs and a cell phone during his 2003-2005 incarceration.   These allegations also are meritless.

First, the Court of Appeals affirmed Judge Robertson's holding that evidence of defendant's 2003-2005 prison conduct (including receipt of a drugs and a cell phone) was intrinsic to the alleged conspiracy, and not "other crimes" evidence under Rule 404(b). Becton, 601 F.3d at 593, 594-95, 598 (affirming Judge Robertson's February 11, 2009 ruling, citing United States v. Bowie, 232 F.3d at 929); 2/11/09 Mem. Op. at 4-7).   Under the principles of law of the case, defendant may not relitigate this underlying issue now, Alaw, 327 F.3d at 1220; Crocker, 49 F.3d at 739, and his claim of ineffectiveness, based on that rejected premise, fails to state a claim.   See United States v. Ramos, 971 F. Supp. 186, 190 (E.D. Pa. 1997)(declining to consider claim that counsel was ineffective for not raising Rule 404(b) objection to admission of evidence of defendant's violent acts, in light of court's conclusion that evidence was properly admitted), aff'd, 151 F.3d 1027 (3d Cir. 1998); see also Held, 11 Fed. Appx. 664, *2 (not ineffective for failing to pursue meritless evidentiary claim).[20]

---

[20]   In any event, even if the law of the case did not apply, the record defeats defendant's claim of deficient representation in connection with counsel's effort to exclude evidence of defendant's incarceration conduct during 2003-2005.   Counsel ably and repeatedly argued for exclusion, under both Rules 404(b) and 403.

Defendant's complaint about counsel's handling of evidence that defendant shot Russell Harris in 2002 (Overt Act 18) also fails.  Defendant argues (at 19) that this evidence ran afoul of Rule 404(b) because it "characterized [m]ovant as a person who sells drugs and commits violence," and that counsel was ineffective for failing to make and pursue such an objection.  This argument is untenable.  The testimony was that defendant shot Harris because Harris was selling a competitor's drugs on the conspiracy's territory during the time of the conspiracy charged (9/16/08 Tr. 217-220; A. 570-71, 573-74; February 11, 2009 Mem. Order at 3 ("Russell Harris testified that when Becton suspected that he was selling drugs in his territory without permission, Becton shot him").  This was direct evidence of the charged conspiracy, not 404(b) evidence.  See United States v. Portillo-Quezada, 469 F.3d 1345, 1352-54 (10th Cir. 2006)(evidence that defendant arranged for murder of coconspirator who failed to pay money owed to the conspiracy and had disclosed its activities to police held direct evidence of conspiracy, not 404(b) evidence); United States v. Thai, 29 F.3d 785, 812-13 (2d Cir. 1994)(evidence that defendant beat coconspirator because he was suspected of not turning over his robbery proceeds to defendant held direct evidence of conspiracy, not 404(b) evidence); United States v. Dierling, 131 F.3d 722, 732 (8th Cir. 1997)(evidence concerning murder of former coconspirator

---

See supra, pp. 22, 25-27.

admissible as direct evidence of conspiracy because it tended to show existence of conspiracy "and how it operated"; not 404(b) evidence); United States v. Edwards, 2012 WL 3834823, *2-3 (D.D.C. 2012)(evidence that defendant threatened his coconspirator with gun in belief that coconspirator had stolen money and cocaine from stash house was "intrinsic to charged conspiracy"). Accordingly, counsel was not deficient for not challenging the shooting evidence on (inapplicable) Rule 404(b) grounds. See Sussman Decl. ¶ 7; Ramos, 971 F. Supp. at 190 (declining to consider claim that counsel was ineffective for not raising Rule 404(b) objection to admission of evidence of defendant's violent acts; evidence was properly admitted); Sayan, 968 F.2d at 65 ("lawyer is not ineffective when he fails to file a meritless motion").[21] Moreover, as shown, counsel doggedly sought to prevent introduction of this evidence on other, arguable grounds, including prejudice and judicial inefficiency. There was no constitutional deficiency here.[22]

_____

[21]   A fair reading of the argument on the admissibility of the evidence at the July 23, 2009 motions hearing strongly suggests that Judge Robertson concluded that it was direct evidence of the conspiracy. See pp. 24-25, supra, discussing July 23, 2008 ruling (7/23/08 Tr. 37-41).

[22]   Further, counsel was not deficient for failure to challenge introduction of the 2002 shooting evidence on the ground that defendant had already been acquitted of the shooting of Russell Harris, see footnote 8, supra. There was no double jeopardy bar here, and hence no deficient performance for failure to assert one. See United States v. Kelly, 552 F.3d 824, 830 (D.C. Cir. 2009)("[e]ven if the same gun supported both charges, the

Further, defendant's concomitant claim (at 23-24, 26) that counsel was ineffective for failure to move for a mistrial or a limiting instruction with respect to admission of both the 2003-2005 contraband evidence and the shooting evidence or to seek an curative instruction, or revisit those issues after Judge Robertson had ruled, should be rejected, too.   See Sussman Decl. ¶¶ 5-6 (counsel did not seek mistrial or limiting instruction, or pursue evidentiary issues after the judge ruled, in exercise of professional judgment), & 7-8; Sayan, 968 F.2d at 65 (lawyer not ineffective when he fails to file a meritless motion); Pollard v. Armontrout, 16 F.3d 295, 297-98 (8th Cir. 1994)(defendant complains that counsel did not depose potential witness and did not object to leading question but "failed to demonstrate how his counsel's representation fell below an objective standard of reasonableness"; denying vague ineffective assistance claims); United States v. Walker, 718 F. Supp. 2d 576, 590 (M.D. Pa. 2010)(where challenged evidence was "inseparable from the criminal event itself," "there was no limiting instruction that would have been applicable," and trial counsel not ineffective for failing to request such instruction). aff'd, 471 Fed. Appx. 92 (3d Cir. 2011), cert.

---

predicate offense required for each charge to stand - conspiracy in Maryland and PWID cocaine here - are different for double jeopardy purposes")(citing United States v. Felix, 503 U.S. 378 (1992) and Blockburger v. United States, 284 U.S. 299 (1932)).  Concomitantly, there was no prejudice flowing from counsel's "failure" to make such an argument.

granted; judgment vacated on other grounds, 2012 WL 2470085 (June
29, 2012); Smith v. Walsh, 2003 WL 21649485, *6 (S.D.N.Y.
2003)(defense counsel declined curative instruction concerning
officer's remark about defendant's intention to shoot officer
because "it would only serve to highlight the statement in the
juror[s'] minds"; no ineffective assistance)(citing United States
v. Sanchez, 790 F.2d 245, 253 (2d Cir. 1986)); cf. Phea v. Benson,
95 F.3d 660, 662 (8th Cir. 1996)(no prejudice flowing from counsel's
failure to ask for curative instruction after victim gave
unresponsive, emotional statement; affirming denial of
ineffectiveness claim); United States v. Voigt, 877 F.2d 1465, 1468
(8th Cir. 1989)(defendant "has not even shown how cross-examination
might have changed the outcome of the trial").[23]

Defendant's claim about defense counsel's opening statement
cannot be maintained either (§ 2255 Mot. 18-19, citing Tr. Tr. 33).
The point of counsel's remarks, see supra pp. 32-33), was to gain
credibility with the jury by conceding lesser facts, and then to
convey, with some effect, that defendant, while not a person who
had led an exemplary life, was "no kingpin and no conspirator."
There was no deficient representation here.   See Sussman Decl.   ¶
4 (explaining strategy behind challenged remarks).   Cf. United
States v. Holman, 314 F.3d 837, 840 (7th Cir. 2002)(conceding guilt

---

[23]   Nor was there any prejudice flowing from counsel's
conduct of the litigation with respect to the these two evidentiary
issues.

on one count of multi-count indictment to bolster case for innocence on remaining counts valid trial strategy, not deficient representation); United States v. Wilks, 46 F.3d 640, 644 (7th Cir. 1995)("[i[n conceding [defendant's] guilt with respect to the one ounce transaction, counsel lent credibility to his argument that [defendant] was only a small fish in the drug world"; no deficient representation); United States v. Tabares, 951 F.2d 405, 409 (1st Cir. 1991)("counsel's concession [on gun possession charges] was a tactical decision, designed to lead the jury towards leniency on the other charges"); Smith v. Walsh, 2003 WL 21649485, *6 (counsel's reference to client during summation as "admitted pimp" was tactical choice; not ineffective); Ramirez v. United States, 17 F. Supp. 2d 63, 68-69 (D.R.I. 1998)(counsel's concession of defendant's guilt on firearms charges not ineffectiveness, but rather, tactical retreat); see also Chandler, 218 F.3d at 1316 (presumption that conduct of "experienced trial counsel" was reasonable is even stronger); Curtis v. United States, 630 F. Supp. 2d 77, 81 (D.D.C. 2009)("[t]rial counsel is a highly experienced Federal Defender" who "has competently appeared before this Court on numerous occasions"; rejecting claims of ineffective assistance).  Nor, on this record, with "overwhelming" evidence of defendant's long-time participation in the violent drug trade, has defendant shown resulting prejudice.

Further, there is no substance to defendant's complaint (at 18) that counsel ineffectively referred to himself as a "[q]uitter." Defendant completely misses the point of his trial counsel's exchange with Judge Robertson, in which counsel ironically referred to himself as a "quit[ter]" (Mot. 18 (citing 7/23/08 Tr. 38)), meaning, of course, that he was anything but. This was in response to Judge Robertson's wry compliment concerning counsel's tenacious courtroom style. See footnote 12.

Defendant also raises a substantive claim that cannot be sustained either. Defendant submits (at 24) that Judge Robertson wrongly allowed "inadmissible testimony . . . based on [his] incarceration from 1995 to 1999." He adds that "[d]espite the fact that the evidence was suppressed the [g]overnment was still allowed to present it during its closing arguments." (§ 2255 Mot. at 24.) Defendant has, however, already litigated this claim in the Court of Appeals, which found only harmless error, and is foreclosed, under the law of the case doctrine, from seeking to renew the issue here. See Becton, 601 F.3d 588, 598-99 (D.C. Cir. 2010)(finding that trial judge erroneously allowed reference to defendant's 1995-2000 incarceration during government's closing argument, but that the error was harmless); Crocker, 49 F.3d at 739 (issues that have been resolved on appeal may not be revisited thereafter in the same case); see also Alaw, 327 F.3d at 1220 (same).

> (4.) Defendant Has Not Shown
> Ineffectiveness as to
> Alleged Failure to Argue
> that Government Had Not
> Established Defendant's
> Prior Drug Conviction
> Beyond Reasonable Doubt
> (Fourth Claim, pp. 27-
> 29).

Defendant's Fourth Claim also is untenable, too.  In essence, defendant claims that, in his sentencing proceeding, counsel was ineffective for failure to argue that defendant was not the same James Becton who was convicted of attempted PWID in D.C. in 1992. Defendant fails to explain, however, how it is that his PDID number was identical to that of the James Becton who was so convicted. See Sayan, 968 F.2d at 65 (attorney not ineffective when he fails to file meritless motion).   In any event, defense counsel skillfully and doggedly challenged the sentencing enhancement, see supra, pp.  24, 31-32, and Judge Robertson took the matter under advisement before ruling for the government, on the strength of Judge Weisberg's unimpeachable set-aside order, not to mention a certified copy of the docket sheet in the relevant case, and the proffered testimony of a Special Proceedings Branch employee (1/30/09 Tr. 5-10).  There was no constitutional deficiency here. See Underwood v. United States, 2006 WL 3513991, *4 (W.D. Va. 2006)(lawyer "not a magician[; h]e cannot make the stubborn facts disappear").  Nor was there any concomitant prejudice.

Equally meritless is defendant's ambiguous complaint (at 28) that counsel ineffectively failed to "challenge[] the [unspecified] document[]s that the government presented under . . . Fed. R. Evid Rule 902(4) for authentication requirements."   On this record, where counsel repeatedly argued against its use on authenticity grounds, it is difficult to discern what authentication objection counsel unreasonably failed to raise.   See Armontrout, 16 F.3d at 297-98 (denying vague ineffective assistance claim).[24]

> (5.) Defendant Has Not Shown Ineffectiveness as to an Alleged Failure to Argue for Sentence below Applicable Guideline Range (Fifth Claim, pp. 30-31).

Defendant's claim that counsel ineffectively failed to argue for a sentence below the guideline range also is without foundation; he misstates the record.   Mr. Sussman told Judge Robertson that defendant was just a small time drug dealer, arguing for a sentence "well below the bottom level of the guidelines" (2/5/09 Tr. 16).  See supra, pp. 40-41 (citing 2/5/09 Tr. 13-16); Garcia v. United States, 1998 WL 37515, *3 (S.D.N.Y. Jan. 30,

_____

[24]    Defendant's passing complaint (at 28) that counsel did not challenge the government's "hearsay evidence" at sentencing under Fed. R. Evid. 802 is untenable; reliable hearsay evidence is admissible at such a proceeding.  See United States v. Francis, 39 F.3d 803, 810 (7th Cir. 1994)(hearsay evidence relied on by sentencing court must be reliable).  Defendant's allegation that counsel was ineffective for not raising a 404(b) objection here is equally without substance; that provision has no bearing on sentencing.

1998)("claim of ineffective assistance . . . regarding this [sentencing] enhancement is without foundation").  Moreover, the judge rejected the government's request for life imprisonment, and imposed a sentence of incarceration (300 months) that was near the low end of the guideline range (292-365), see <u>supra</u> at pp. 2, 40-41.

CONCLUSION

For the reasons stated, the Court should deny summarily defendant's § 2255 motion.

Respectfully submitted,

RONALD C. MACHEN JR. (D.C. Bar 447-889)
United States Attorney

ROBERT D. OKUN (D.C. Bar 457-078)
Chief, Special Proceedings Division

/s/ Thomas S. Rees
THOMAS S. REES (D.C. Bar 358-962)
Assistant United States Attorney
Special Proceedings Division
555 Fourth Street, N.W., Tenth Floor
Washington, D.C. 20530
(202) 252-7556
FAX (202) 252-7559
Thomas.S.Rees@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 16th day of October, 2012, the foregoing Opposition was filed via ECF and placed in the internal receptacle for outgoing first-class mail, addressed as follows:

James Becton
Fed. Reg. 07115-007
FCI Greenville
Federal Correctional Institution
P.O. Box 5000
Greenville, Illinois 62246


<u>/s/ Thomas S. Rees</u>
THOMAS S. REES
ASSISTANT UNITED STATES ATTORNEY