**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **Criminal No. 07-131-TNM-JMF-1** |
| | ) | |
| **JAMES BECTON,** | ) | |
| Defendant. | ) | |

**UNITED STATES' OPPOSITION TO DEFENDANT'S**
**MOTION FOR RELIEF UNDER 18 U.S.C. § 3582(c)(1)(A)**

The United States, by and through its attorney, the Acting United States Attorney for the District of Columbia, respectfully submits this opposition to defendant's Motion for Relief Under 18 U.S.C. § 3582(c)(1)(A) [Dkt. 601]. Defendant, whose sentence was recently reduced from 300 to 246 months pursuant to 18 U.S.C. § 3582(c)(2), *see* Dkt. 599, now seeks a further reduction that would result in his immediate release. Defendant asserts that he suffers from health conditions that place him at greater risk of serious illness from COVID-19, and further asserts that he rejected the opportunity to be vaccinated against COVID-19 because he believes that the vaccine is in some way incompatible with the medicine he takes for ulcerative colitis. *See* Dkt. 601 at 1-2. Defendant's compassionate release motion is not accompanied by any medical records showing his purported health conditions, nor does it identify any medical or scientific sources to support his concern about the vaccine. *See United States v. Broadfield*, --- F.4th ----, 2021 WL 3076863, at *2 (7th Cir. July 21, 2021) ("The federal judiciary need not accept a prisoner's self-diagnosed skepticism about the COVID-19 vaccines as an adequate explanation for remaining unvaccinated . . . .").

The government opposes defendant's request for compassionate release on multiple grounds, each of which is sufficient on its own to defeat defendant's motion. First, defendant has failed to satisfy his burden of demonstrating that he suffers from health conditions that establish an extraordinary and compelling reason for release in light of COVID-19. In his recent motions

seeking sentence reductions pursuant to § 404 of the First Step Act and 18 U.S.C. § 3582(c)(2), defendant claimed that he was at increased risk from COVID-19 because he "suffers from asthma." Dkt. 587 at 7; *see also* Dkt. 595 at 8, 13. Defendant's medical records from the Federal Bureau of Prisons ("BOP"), however, do not include any reference to an asthma diagnosis, and defendant's instant motion appears to have abandoned this claim. *See* Ex. 1 (BOP Medical Records 2018-2021, filed under seal).[1] Defendant now asserts, for the first time, that he "suffers from HIV." Dkt. 601 at 1. Defendant did not mention HIV when describing his health issues in his earlier sentence reduction motions, *see* Dkt. 587, 595, nor did he mention HIV in his requests for compassionate release to the Warden of his BOP facility, *see* Ex. 2. Furthermore, defendant's BOP medical records contain no reference to any HIV diagnosis; to the contrary, the records show that defendant tested negative for HIV in both 2012 and 2018. *See* Ex. 1 at 314, 374. Defendant's BOP medical records do confirm his assertion that he suffers from ulcerative colitis and anemia, but neither of those ailments have been identified by the Centers for Disease Control and Prevention ("CDC") as conditions that make someone more likely to get severely ill from COVID-19.

Second, defendant's request for compassionate release fails because he has refused to be vaccinated against COVID-19. According to defendant's motion, defendant believes that the vaccine would be incompatible with the medication that he takes for colitis. *See* Dkt. 601 at 2. Defendant, however, does not offer any evidence to validate this concern beyond asserting that the medication in question "suppresses his immune system." *Id*. According to the Crohn's & Colitis Foundation, however, the medication defendant takes for colitis (mesalamine) is "not [an] immune suppressant medication[]," and patients taking this medicine "do not need to take extra precautions

---

[1]     Concurrently with filing this opposition brief, the government is also filing a motion for leave to file a sealed exhibit with respect to defendant's BOP medical records.

[with respect to COVID-19] beyond CDC recommendations regarding proper hygiene." *See* https://www.crohnscolitisfoundation.org/coronavirus/ibd-medication.[2]

Third, even if defendant had satisfied his burden of demonstrating an extraordinary and compelling reason (which he has not), he has failed to meet his additional burden of showing that granting his immediate release is warranted in light of the factors set forth in 18 U.S.C. § 3553(a). The nature of defendant's offense, which involved his leadership role in a violent drug conspiracy that spanned more than a decade, weighs against further reducing his sentence, as does defendant's criminal history. In addition, defendant's disciplinary record during his incarceration has been poor, including his commission of an assault in 2016 at the age of 42.

For all of these reasons, and as discussed more fully herein, defendant's motion for compassionate release should be summarily denied.

## **FACTUAL BACKGROUND**

Defendant's convictions in this case are based upon his role as the leader of a conspiracy to distribute drugs that began in 1995 and continued into 2007. In the order denying defendant's motion for a new trial, the Court summarized the evidence from defendant's trial as follows:

> Numerous witnesses, including several who had been charged with [defendant], testified to [defendant's] participation in drug distribution in and around the 4200 and 4300 blocks of Fourth Street, S.E., in Washington, D.C., focusing on a parking lot known as the "second court" where [defendant] eventually became the exclusive wholesale cocaine and crack distributor for the street level sellers.
>
> The group selling drugs in the second court sometimes referred to their dealings with each other as the "program." The street dealers sold their drugs in "rotation," the standing rule being that [defendant], who sometimes dealt crack hand to hand himself, could sell whenever he wanted. Members of the program used a communal apartment rented under the name of one of [defendant's] cousins to cook and store

---

[2]      Furthermore, even if defendant's characterization of mesalamine as an immunosuppressant were accurate, medical professionals recommend that "people on immunosuppressive therapies can and should get vaccinated" against COVID-19. *See* https://www.healthline.com/health-news/these-prescription-drugs-may-reduce-efficacy-of-covid-19-vaccines.

drugs, to rest, and to house an attack dog that was used to enforce the group's dominance over the area. . . .

Christian Donaldson testified that she helped [defendant] in his wholesale drug business . . . . Donaldson told how [defendant] and his associates maintained control over the territory by the threat of violence, and how [defendant] possessed and used guns. Russell Harris testified that when [defendant] suspected that he was selling drugs in his territory without permission, [defendant] shot him. Donaldson also related [defendant]'s admission that he had been involved in a gun fight in California over a drug deal that fell apart. Russell Ramseur testified about numerous significant drug deals between himself and [defendant].

Agents gave testimony about drugs, drug paraphernalia, and weapons seized from apartments connected to [defendant]'s drug dealing activities, and they showed surveillance films. The jury heard numerous recorded wiretapped phone conversations, some of them interpreted in court by a participant in the call, where [defendant] spoke about selling or purchasing drugs to or from indicted co-conspirators, about collecting drug money, and about his drug business in general.

Dkt. 330 (Mem. Order 2/11/09) at 1-3. According to the judge who presided over defendant's trial, the Hon. James Robertson, "this was not a close case; the evidence against [defendant] was unambiguous and overwhelming." *Id.* at 11.

## PROCEDURAL HISTORY

On October 17, 2007, a grand jury indicted defendant and ten others with one count of Conspiracy to Distribute and Possess with Intent to Distribute 50 Grams or More of Cocaine Base, 5 Kilograms or More of Cocaine, and Cannabis, in violation of 21 U.S.C. § 846 ("the drug conspiracy"). *See* Dkt. 95 (Superseding Indictment). Defendant was also charged with numerous counts relating to the unlawful use of a telephone to facilitate the conspiracy in violation of 21 U.S.C. § 843(b) and 18 U.S.C. § 2 ("telephone use charges"). *See id.*

After a jury trial before the Hon. James Robertson, defendant was convicted of the drug conspiracy charge and ten telephone use charges. *See* Dkt. 248. At sentencing, the Court imposed an aggregate sentence of 300 months' incarceration. *See* Dkt. 329 (Judgment). In rejecting defense counsel's arguments for a more lenient sentence, the Court noted that defendant "clearly never did

anything with his life except deal drugs, was in prison at least twice for it, didn't learn then right from wrong; unbelievably was involved in smuggling drugs in and out of a federal prison down in Virginia . . . and has done nothing to demonstrate that he is entitled to any leniency from the Court." Dkt. 347 at 17. Directly addressing defendant, the Court added that he had "spread[] poison among your community," and "that's why you were a threat to the community and that's why you need to be removed from the community." *Id*. at 17-18.

On April 16, 2010, the D.C. Circuit Court of Appeals issued a decision rejecting all of defendant's claims on direct appeal and affirming his convictions. *See United States v. Becton,* 601 F.3d 588 (D.C. Cir. 2010). Defendant thereafter filed multiple post-conviction collateral attack motions pursuant to 28 U.S.C. § 2255, all of which were rejected by the Court. *See United States v. Becton*, 2014 WL 12815416 (D.D.C. Apr. 23, 2014); *United States v. Becton*, 2014 WL 7372823 (D.D.C. Dec. 19, 2014). The D.C. Circuit affirmed the Court's denials of defendant's § 2255 motions. *See* D.C. Circuit #14-3032 (Order 2/20/15); D.C. Circuit #16-3082 (Order 9/7/16).

On April 23, 2020, defendant filed a motion seeking a sentence reduction pursuant to § 404 of the First Step Act of 2018. *See* Dkt. 587. On October 23, 2020, the Hon. Ketanji Brown Jackson issued a Memorandum Opinion and Order holding that defendant was not eligible for relief under § 404 of the First Step Act because his sentence was based only on powder cocaine offenses, not crack cocaine offenses. *See* Dkt. 592 at 3-5. Defendant's First Step Act § 404 motion had also argued for relief based upon defendant's purported health conditions, asserting that defendant was at increased risk from COVID-19 because he "suffers from asthma and also has a compromised immune system." Dkt. 587 at 7. The Court, however, declined to consider this claim under § 404 of the First Step Act, explaining that defendant must seek relief on those grounds by filing a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A). *See* Dkt. 592 at 8.

On December 23, 2020, at the Court's behest, *see id*. at 9, defendant filed a Supplemental Memorandum seeking a sentence reduction under 18 U.S.C. § 3582(c)(2). *See* Dkt. 595. Defendant claimed – and the government did not contest, *see* Dkt. 596 at 7 – that defendant was sentenced based upon a guidelines range that the Sentencing Commission had subsequently lowered, and that the change had been made retroactive. Defendant's supplemental brief also reiterated his claim that he was at increased risk from COVID-19 because he "continues to suffer from asthma, and has a compromised immune system due to medication he must take." Dkt. 595 at 8. At a hearing on May 4, 2021, the Court granted defendant's motion in part, reducing his sentence from 300 to 246 months pursuant to 18 U.S.C. § 3582(c)(2). *See* Dkt. 599. The Court, however, again declined to consider defendant's purported health conditions, noting that relief on those grounds must be sought by filing a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A).

On June 25, 2021, defendant filed a motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A), asserting that he was at increased risk from COVID-19 because he purportedly suffers from HIV, chronic ulcerative colitis, and anemia. *See* Dkt. 600. The motion did not address whether defendant had been offered a COVID-19 vaccine. The Court denied the motion without prejudice because defendant had failed to append a proposed order. *See* Minute Order (June 25, 2021). The Court further instructed: "If Defendant moves again for a sentence reduction, his motion shall state the relief he seeks and whether he has been vaccinated. If he has refused vaccination, Defendant should explain why relief is appropriate considering the various denials of similar relief based on failure to accept vaccination." *Id*.

On July 9, 2021, defendant filed the instant Motion for Relief Under 18 U.S.C. § 3582(c)(1)(A), now accompanied by a proposed order seeking his immediate release. *See* Dkt. 601, 602. Defendant's motion acknowledges that he was offered a COVID-19 vaccine and refused it.

According to the motion, defendant's refusal was based on his concern that the vaccine would be incompatible in some way with the medication that he takes for ulcerative colitis. *See* Dkt. 601 at 2. Defendant's motion is not accompanied by any medical records showing his purported health issues, nor does it identify any medical or scientific sources to support his concern about the vaccine.

Defendant is currently incarcerated at Hazelton FCI in West Virginia. *See* Ex. 3 (BOP Inmate Profile). Defendant is projected to complete his 246-month sentence – which has been reduced from 300 months pursuant to 18 U.S.C. § 3582(c)(2) – on July 29, 2025. *See id.* All inmates in BOP custody are classified on a scale of Care Level 1 (healthiest) to Care Level 4 (required to be housed in a medical facility). *See* https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf. Defendant's medical care is currently classified as Care Level 2, designating "stable, chronic care." *See* Ex. 3 at 1. Defendant's BOP medical records confirm that he suffers from ulcerative colitis and iron deficiency anemia, both of which are controlled by medication. *See* Ex. 1 at 4, 16. However, there is no reference in defendant's medical records to any diagnosis for either asthma or HIV. In fact, defendant's records show that he tested negative for HIV in 2012 and 2018. *See id.* at 314, 374. Furthermore, contrary to defendant's claim that he "contracted COVID-19 in December 2020," Dkt. 601 at 2, his medical records show no record of any COVID diagnosis at that time (or any time), nor do they document any illness during that time period with COVID-like symptoms. *See id.* at 53 (9/21/20 clinic visit for colitis); 50 (12/15/20 clinic visit for medication refill); 7 (2/10/21 clinic visit for skin problem).

## **BOP'S RESPONSE TO THE COVID-19 PANDEMIC**

### I.   **Vaccination Information and Updates**

BOP is committed to making the COVID-19 vaccine available to all staff and inmates who choose to receive it as quickly as possible. BOP is working with the CDC and the federal government's COVID-19 Vaccine/Therapeutics Operation (formerly known as Operation Warp

Speed). By early February 2021, vaccine doses had been delivered to every BOP institution. BOP offered the vaccine first to full-time staff because staff members – who come and go between the facility and the community – present a more likely vector for COVID-19 transmission into an institution. BOP's goal is to use every dose of the vaccine that the agency receives. Therefore, although BOP offered the vaccines to staff members first, inmates were able to receive vaccines if doses were available locally. Vaccines now have been administered to all willing staff members. BOP continues to encourage staff members who have not accepted a vaccine to do so. Staff members may also obtain and have obtained vaccinations from other providers in the community.

For the past few months, and continuing to the present day, BOP has been offering vaccines to inmates, proceeding based on priority of need in accordance with CDC guidelines. In general, the vaccine is offered first to inmates over 75 years of age; then to inmates over 65 years of age; then to inmates of any age who present a condition identified by the CDC as presenting a risk of severe COVID-19 disease; and then to all inmates. As of August 9, 2021, BOP has administered over 208,000 doses to staff and inmates nationwide.[3] *See* COVID-19 Vaccine Implementation, available at: https://www.bop.gov/coronavirus.

The vaccines approved for emergency use by the FDA are effective in significantly reducing the rate of infection and dramatically reducing the risk of severe outcomes. In its Emergency Use Authorization memoranda, the FDA stated that the Pfizer-BioNTech vaccine was 95% effective in preventing COVID-19, including in study participants with medical comorbidities associated with

---

[3]     As of April 18, 2021, BOP had administered approximately 136,000 doses. As of May 18, 2021, BOP had administered approximately 174,000 doses. Hence, the vaccination rollout at BOP facilities is moving quickly and efficiently. *See United States v. Roper*, 2021 WL 963583, at *3 (E.D. Pa. Mar. 15, 2021) (Kearney, J.) ("Since the vaccines became available, the Bureau of Prisons diligently and efficiently administered the doses allocated to it, leading all jurisdictions and Federal entities in its vaccine utilization rate.") (footnote omitted).

high risk of severe COVID-19; the Moderna vaccine was approximately 95% effective in preventing COVID-19, including in study participants with medical comorbidities associated with high risk of severe COVID-19.[4]

Various studies confirm the efficacy of the vaccines. For instance, on April 1, 2021, Pfizer reported its follow-up study on the 44,000 participants in its Phase 3 trial. It found that the vaccine, based on mRNA technology (like the Moderna vaccine), was 91.3% effective against COVID-19, measured seven days through up to six months after the second dose, across age, gender, race, and ethnicity demographics, across participants with a variety of underlying conditions, and during a period through March 13, 2021, when variants were circulating. Pfizer further found that the vaccine was 100% effective against severe disease as defined by the CDC and 95.3% effective against severe disease as defined by the FDA. https://www.businesswire.com/news/home/20210401005365/en.

Similarly, the CDC reported the effectiveness of the Pfizer and Moderna vaccines in preventing infection during the same period and concluded that its extensive data "reinforce CDC's recommendation of full 2-dose immunization with mRNA vaccines. COVID-19 vaccination is recommended for all eligible persons. . . ." "Interim Estimates of Vaccine Effectiveness," https://www.cdc.gov/mmwr/volumes/70/wr/mm7013e3.htm (Mar. 29, 2021). A study issued on April 28, 2021, and reported by the CDC, found that the efficacy rate of the Pfizer and Moderna vaccines was the same (approximately 94%) in the population over the age of 65 as in the population

---

[4]     The Janssen (Johnson & Johnson) vaccine was approximately 66% effective in preventing moderate to severe COVID-19 and approximately 85% effective in preventing severe COVID-19, with similar efficacy rates for study participants with medical comorbidities. BOP has offered this vaccine in limited numbers primarily to inmates at BOP pretrial and transfer facilities, given the transitory nature of the populations at those institutions and the advantage there of employing a single-dose vaccine. BOP has elsewhere relied on the Pfizer and Moderna vaccines, including at Hazelton FCI, where defendant was offered (and refused) a Pfizer vaccine. Hence, we focus our discussion here on the Pfizer and Moderna vaccines.

of adults as a whole, showing the effectiveness of the vaccines even in a group that is particularly vulnerable to severe outcomes from COVID-19. *See* https://www.cdc.gov/mmwr/volumes/70/wr/mm7018e1.htm?s_cid=mm7018e1_w.

The vaccines are remarkably effective in limiting not only infection but also severe disease or death after rare "breakthrough" infections. "Nearly all COVID-19 deaths in the U.S. now are in people who weren't vaccinated, a staggering demonstration of how effective the shots have been."[5] The vaccines, the CDC director explained, "are nearly 100 percent effective against severe disease and death, meaning nearly every death due to covid-19 is particularly tragic because nearly every death, especially among adults, due to covid-19 is, at this point, entirely preventable."[6] That remains true even with the rise of the delta variant.[7]

Although possible, "vaccine breakthrough cases occur in only a small percentage of vaccinated people."[8] And among the vaccinated, severe COVID-19 cases – let alone death – are exceedingly rare. As of August 2, 2021, out of the more than 164 million fully vaccinated people in

---

[5]    Carla K. Johnson & Mike Stobbe, *Nearly All Covid Deaths in U.S. Are Now Among Unvaccinated*, L.A. Times (June 24, 2021), https://www.latimes.com/science/ story/2021-06-24/ nearly-all-covid-deaths-in-us-are-now-among-unvaccinated.

[6]    Ariana Eunjung Cha et al., *Spread of Delta Coronavirus Variant Exposes Poorly Vaccinated Regions to Renewed Danger*, Wash. Post (June 23, 2021), https://www.washingtonpost.com/health/delta-variant-us-cases/2021/06/23/ca715f8c-d371-11eb-9f29-e9e6c9e843c6_story.html.

[7]    *Press Briefing by White House COVID-19 Response Team and Public Health Officials*, White House (July 22, 2021), https://www.whitehouse.gov/briefing-room/press-briefings/2021/ 07/22/press-briefing-by-white-house-covid-19-response-team-and-public-health-officials-46/ (Surgeon General: "99.5 percent of COVID-19 deaths and 97 percent of possible hospitalizations are among the unvaccinated").

[8]    Centers for Disease Control and Prevention, *COVID-19 Vaccine Breakthrough Case Investigation and Reporting*, https://www.cdc.gov/vaccines/covid-19/health-departments/ breakthrough-cases.html (last visited August 9, 2021).

the country, breakthrough infections have been found in only 7,525 hospitalizations and 1,507 deaths, many of which were not attributable to COVID-19 at all.

The CDC website reflects the following:

| Hospitalized or fatal vaccine breakthrough cases reported to CDC: | 7,525 | |
|---|---|---|
| Female | 3,615 | (48%) |
| People aged ≥65 years | 5,557 | (74%) |
| Asymptomatic infections | 1,347 | (18%) |
| Hospitalizations* | 7,101 | (94%) |
| Deaths† | 1,507 | (20%) |

*1,816 (26%) of 7,101 hospitalizations reported as asymptomatic or not related to COVID-19
†316 (21%) of 1,507 fatal cases reported as asymptomatic or not related to COVID-19

*See* https://www.cdc.gov/vaccines/covid-19/health-departments/breakthrough-cases.html (last visited August 9, 2021).

Information on BOP's COVID-19 vaccination efforts, including a listing by facility that is updated daily, is found here: https://www.bop.gov/coronavirus/. The clinical guidance provided to BOP health service professionals is found here: https://www.bop.gov/resources/pdfs/ covid19_vaccine_guidance_20210311.pdf.

## II.   BOP's Response to the Pandemic

As the Court is aware, from the outset of the pandemic, BOP has made extensive changes to its operations, based on a plan that was prepared over many years, and refined in early 2020 in consultation with the CDC and the World Health Organization. Those efforts continue.

The government recognizes that the COVID-19 case rate at a particular institution may change at any time. We therefore focus primarily in this opposition on considerations specific to defendant. But BOP's success at many institutions in limiting the spread of the virus, and in stemming outbreaks when they occur, provides an important backdrop for defendant's motion.

BOP's "action plan" is described in detail at www.bop.gov/coronavirus/covid19_status.jsp. As part of that plan, all newly arriving inmates are quarantined and not released into the general

population until 14 days have passed and the inmate has tested negative; inmate movement within an institution is restricted in order to promote social distancing; mask wearing by inmates and staff is required; all facility staff are screened for symptoms daily; social visiting has been suspended at nearly all institutions; and access by other outsiders is restricted to only those performing essential services, who are also screened before entry.

In addition, acting under the authority granted in the CARES Act, BOP has transferred many thousands of inmates to home confinement, focusing on nonviolent offenders who have served the majority of their sentences. This initiative, combined with the reduced number of new arrivals during the pandemic and the ordinary release of prisoners upon completion of their sentences, has led to a dramatic decrease in the total BOP population, which in turn has increased opportunities for social distancing and reduced the strain on BOP resources. The total BOP population, which was approximately 170,000 at the beginning of the pandemic, is now more than 10% lower, at the lowest level in decades.[9]

When an outbreak does occur, any infected inmate is immediately quarantined, and all contacts (including entire housing units if warranted) are tested and quarantined as necessary, until all contacts return at least two negative tests in a two-week period.

BOP's efforts have been fruitful. There is no way to stop this virus short of widespread vaccination. Some inmates inevitably will be infected and some of that cohort may succumb, just as in the population at large. However, the rate of deaths in federal prisons as a whole has been lower

---

[9]   Currently, BOP has approximately 7,492 inmates on home confinement. The total number of inmates placed in home confinement from March 26, 2020 to the present (including inmates who have fully completed their sentences) is approximately 29,614. See Federal Bureau of Prisons, COVID-19 Home Confinement Information, at https://www.bop.gov/coronavirus (last visited August 9, 2021).

than that in the general U.S. population, a notable achievement given the known risks of viral spread

in a congregate prison setting.

## ARGUMENT

**I.     Legal Principles for Compassionate Release Motions**

This matter comes before the Court on defendant's motion for compassionate release

pursuant to 18 U.S.C. § 3582(c)(1)(A). Before the enactment of the First Step Act in 2018, only

the Bureau of Prisons could seek compassionate release for a defendant. *See United States v. Long*,

997 F.3d 342, 348 (D.C. Cir. 2021). With the passage of the First Step Act, however, defendants

now may file for compassionate release on their own behalf. *See id.* As amended by the First Step

Act, § 3582(c)(1)(A) now states in relevant part as follows:

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion
> of the defendant after the defendant has fully exhausted all administrative rights to
> appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf
> or the lapse of 30 days from the receipt of such a request by the warden of the
> defendant's facility, whichever is earlier, may reduce the term of imprisonment
> (and may impose a term of probation or supervised release with or without
> conditions that does not exceed the unserved portion of the original term of
> imprisonment), after considering the factors set forth in section 3553(a) to the
> extent that they are applicable, if it finds that –
>
> > (i) extraordinary and compelling reasons warrant such a reduction; . . .
>
> > and that such a reduction is consistent with applicable policy statements issued
> > by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A).

The policy statement referenced in § 3582(c)(1)(A) is U.S.S.G. § 1B1.13. In *Long*, the D.C.

Circuit held that § 1B1.13 "is not applicable to compassionate release motions filed by

defendants." *Long*, 997 F.3d at 347. The Court of Appeals observed that the policy statement was

issued before the First Step Act was enacted and that "[t]he Sentencing Commission has lacked a

quorum since early 2019, and so it has been unable to update its preexisting policy statement

concerning compassionate release to reflect the First Step Act's changes." *Id.* at 348. Hence, the policy statement is inapplicable to a motion for a reduction of sentence brought by a defendant because the statement, by its terms, refers only to motions brought by the Director of BOP. *See id.* at 355. *Long* reiterated, however, that "courts still must consider and weigh the factors laid out in Section 3553(a)" before ruling on a defendant-filed motion for compassionate release. *Id*. at 356.

As the movant, defendant bears the burden to establish that early release is warranted. *See United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014). To do so, defendant must show (a) that he has exhausted his right to appeal the BOP's failure to seek compassionate release on his behalf or that 30 days have lapsed since he sought a reduction in sentence from the warden of his BOP facility; (b) the existence of extraordinary and compelling circumstances sufficient to warrant his early release; and (c) that weighing the applicable § 3553(a) factors counsels in favor of early release.

## II.    Defendant Has Not Shown That He Is Entitled to Compassionate Release

Although the government agrees that defendant has exhausted administrative remedies, and his motion is thus properly before the Court, the Court should deny defendant's request for compassionate release. First, defendant has not satisfied his burden of demonstrating that he suffers from health conditions that establish an "extraordinary and compelling reason" for release. Second, defendant's refusal of the Pfizer vaccine also prevents him from showing that he is entitled to relief based upon his purported increased risk from COVID-19. Third, even if defendant had established an "extraordinary and compelling reason" (which he has not), the factors enumerated in 18 U.S.C. § 3553(a) weigh strongly against granting his request for immediate release.

### A.  Defendant Has Exhausted Administrative Remedies

As noted, § 3582(c) provides that a court may not modify a term of imprisonment once it has been imposed unless it does so "upon motion of the Director of the Bureau of Prisons, or upon

motion of the defendant after the defendant has fully exhausted all administrative rights to appeal

a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30

days from the receipt of such a request by the warden of the defendant's facility, whichever is

earlier. . . ." § 3582(c)(1)(A). On September 10, 2020, defendant submitted a request to the Warden

of his BOP facility for a reduction in his sentence based upon a purported "debilitated medical

condition," which defendant identified as "[ulcerative] colitis." Ex. 2 at 3. On September 23, 2020,

the Warden informed defendant that his request had been denied because he did not have a

qualifying medical condition. *See id*. at 5. On May 6, 2021, defendant submitted a new request to

the Warden for a reduction in sentence, this time based on unspecified "underlying health

conditions that make [defendant] more susceptible to severe [COVID]." *Id*. at 1. On May 14, 2021,

the Warden informed defendant that his request had been evaluated and denied. *Id*. at 2. The

government thus agrees that defendant has exhausted administrative remedies in this case.

### B.  Defendant Has Not Shown That He Suffers from Health Conditions That Heighten His Risk of Serious Illness from COVID-19

The mere existence of the COVID-19 pandemic, which poses a general threat to every non-

immune and unvaccinated person in the country, cannot alone provide a basis for a sentence

reduction under § 3582(c)(1)(A). As the Third Circuit held, "the mere existence of COVID-19 in

society and the possibility that it may spread to a particular prison alone cannot independently

justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Section

3582(c)(1)(A) contemplates sentence reductions for specific individuals, not the widespread

prophylactic release of inmates and the modification of lawfully imposed sentences to deal with a

world-wide viral pandemic. That does not mean, however, that COVID-19 is irrelevant to a court's

analysis of a motion under § 3582(c)(1)(A). If an inmate is elderly and/or has a chronic medical

condition that has been identified as elevating the inmate's risk of becoming seriously ill from

COVID-19, the government agrees that condition may satisfy the standard of "extraordinary and compelling reasons," even if that condition would not have constituted an "extraordinary and compelling reason" absent the risk of COVID-19.

Defendant's BOP medical records, however, do not support his assertion that he has health conditions that establish an "extraordinary and compelling reason" for release due to an increased risk from COVID-19. Defendant's motion identifies three specific ailments as the basis for his requested release: HIV, chronic ulcerative colitis, and iron deficiency anemia. Defendant's medical records show that his only HIV test results while incarcerated have been negative, and the CDC has not identified either ulcerative colitis or anemia as conditions that increase the risk of severe illness from COVID-19. Furthermore, defendant offers no evidence to support his claim that the medication that he takes to treat colitis (mesalamine) suppresses his immune system. *See* www.crohnscolitisfoundation.org/sites/default/files/legacy/assets/pdfs/aminosalicylates.pdf (stating that mesalamine, which is an aminosalicylate drug, is not an "immunosuppressant").

On March 29, 2021, the CDC posted revised guidance on its website, advising that adults of any age with certain conditions can be more likely to get severely ill from COVID-19.[10] This guidance was most recently updated on May 13, 2021. The conditions identified by the CDC are:

---

[10]     Before March 29, 2021, the CDC presented one list of conditions that definitively entailed a greater risk of severe illness and one list of conditions that "might" entail a greater risk of severe illness. The conditions on the "might" list were asthma (moderate-to-severe); cerebrovascular disease; cystic fibrosis; hypertension; immunocompromised state from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines; neurologic conditions, such as dementia; liver disease; being overweight; pulmonary fibrosis; thalassemia; and type 1 diabetes mellitus. At that time, the government maintained that defendants with conditions on the "might" list did not present an extraordinary basis for relief.

In the March 29 revision, the CDC merged the two lists without extensive explanation. The CDC also presents a page with information for healthcare providers, which discusses the evidentiary basis for designating each risk factor and indicates that there remains less extensive support for drawing conclusions regarding most conditions formerly listed as "might" factors. *See* www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-care/underlyingconditions.html.

- Cancer
- Chronic kidney disease
- Chronic lung diseases, including COPD (chronic obstructive pulmonary disease), asthma (moderate-to-severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension
- Dementia or other neurological conditions
- Diabetes (type 1 or type 2)
- Down syndrome
- Heart conditions (such as heart failure, coronary artery disease, cardiomyopathies, or possibly hypertension)
- HIV infection
- Immunocompromised state (weakened immune system)
- Liver disease
- Overweight and obesity
- Pregnancy
- Sickle cell disease or thalassemia
- Smoking, current or former
- Solid organ or blood stem cell transplant
- Stroke or cerebrovascular disease
- Substance abuse disorders

*See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited August 9, 2021).[11] During the pandemic, in accordance with these guidelines, the government acknowledges that an inmate who has not been offered a vaccine and who presents one of the risk factors on the CDC list as confirmed by medical records – and is not expected to recover from that condition – presents an extraordinary and compelling reason.

Defendant's motion asserts that he suffers from HIV, *see* Dkt. 601 at 1, which the CDC recognizes as a condition that increases the risk of severe illness from COVID-19. This assertion, however, is not supported by any available evidence. Defendant's motion does not provide any medical records showing that he has been diagnosed with HIV. Defendant's BOP medical records show that he tested negative for HIV in 2012, *see* Ex. 1 at 314, and again tested negative for HIV in 2018, *see id*. at 374. There is no reference in defendant's medical records to any subsequent

---

[11]     The CDC's guidance notes that this list does not include all medical conditions that could make a person more likely to get severely ill; thus, rare medical conditions are not included.

HIV test or diagnosis. Notably, defendant himself did not reference HIV in either of his requests to the Warden for a sentence reduction based upon his health conditions. *See* Ex. 2. Nor did defendant mention HIV when describing his health issues in his earlier sentence reduction motions. *See* Dkt. 587, 595. To the contrary, defendant's primary claim in those earlier motions was that he was at increased risk from COVID-19 because he purportedly "suffers from asthma." Dkt. 587 at 7; *see also* Dkt. 595 at 8, 13. Defendant's medical records also include no reference to any asthma diagnosis, and defendant's instant motion appears to have abandoned this claim. For these reasons, defendant has not shown that he is at increased risk from COVID-19 based upon HIV.

Defendant's medical records do confirm that he suffers from ulcerative colitis and iron deficiency anemia, both of which are currently well-controlled with the aid of medication. *See* Ex. 1 at 4, 16; *see also* Ex. 3 at 1 (classifying defendant's medical status as Care Level 2: "stable, chronic care"); *id*. at 2 (showing defendant is cleared for regular work duty, with "no medical restrictions"). Neither of these conditions, however, has been identified by the CDC as increasing the risk for negative outcomes from COVID-19. For this reason, other courts have denied compassionate release motions brought by inmates with ulcerative colitis. *See, e.g., United States v. Naber*, 2021 WL 791868, at *3 (D.N.J. Mar. 1, 2021) (gastrointestinal conditions including stomach ulcers, colitis, and bile duct strictures are not risk factors for severe illness from COVID); *United States v. Ghassabi*, 2021 WL 568279, at *3 (W.D. Wash. Feb. 16, 2021); *United States v. Dan*, 2020 WL 3453845 (D. Haw. June 24, 2020); *United States v. Bartlett*, 2020 WL 3077940 (E.D. Wis. June 9, 2020). The same is true for anemia. *See, e.g., United States v. Neveaux*, 2020 WL 4747713, at *4 (E.D. La. Aug. 17, 2020) (anemia is not a COVID risk factor).

Finally, to the extent that defendant's motion can be read as asserting that he presents the CDC-recognized COVID risk factor of being in an "immunocompromised state" due to his colitis

medication, *see* Dkt. 601 at 2 ("The medication for his chronic colitis suppresses his immune system."), defendant has failed to support that assertion with any evidence. Although the medicine in question is not identified by name in defendant's motion, his BOP medical records reveal that it is mesalamine, which defendant takes twice per day to treat his ulcerative colitis. *See* Ex. 1 at 4. According to the Crohn's & Colitis Foundation, mesalamine is not an "immunosuppressant." *See* www.crohnscolitisfoundation.org/sites/default/files/legacy/assets/pdfs/aminosalicylates.pdf.    In fact, patients taking mesalamine are advised that they "do not need to take extra precautions [with respect to COVID-19] beyond CDC recommendations regarding proper hygiene." *See* https://www.crohnscolitisfoundation.org/coronavirus/ibd-medication. Defendant has provided no medical or scientific authority to show that mesalamine suppresses his immune system and thereby increases his risk from COVID. *See United States v. Lear*, 2021 WL 2392418, at *4 (C.D. Ill. June 11, 2021) (denying compassionate release because ulcerative colitis is not a COVID risk factor and defendant failed to show that his prescribed colitis medication is an immunosuppressant).

For all of these reasons, defendant has failed to show that he suffers from health conditions that increase his risk of severe illness from COVID-19, and his motion for compassionate release should be denied on this basis alone.

### C. Defendant's Motion for Compassionate Release Also Fails Because He Has Refused a COVID-19 Vaccine

Furthermore, even assuming arguendo that defendant's asserted medical conditions constitute an "extraordinary and compelling reason" under the statute (which, as addressed above, they do not), his compassionate release motion would fail because he has rejected an opportunity to be vaccinated against COVID-19. Defendant was offered the Pfizer vaccine at his BOP facility on March 9, 2021, and he refused to receive it. *See* Ex. 1 at 28, 48.

Defendant's motion asserts that his refusal was based on his concern that the COVID vaccine is in some way incompatible with mesalamine, the medication that defendant takes for ulcerative colitis. *See* Dkt. 601 at 1-2. Defendant does not, however, identify any medical or scientific sources to support this concern about the vaccine. *See United States v. Broadfield*, --- F.4th ----, 2021 WL 3076863, at *2 (7th Cir. July 21, 2021) ("The federal judiciary need not accept a prisoner's self-diagnosed skepticism about the COVID-19 vaccines as an adequate explanation for remaining unvaccinated . . . ."). Defendant's motion instead relies on the bare assertion – unsupported by any evidence – that his colitis medicine "suppresses his immune system." Dkt. 601 at 2. As noted above, however, mesalamine is not, in fact, an "immunosuppressant." *See* www.crohnscolitisfoundation.org/sites/default/files/legacy/assets/pdfs/aminosalicylates.pdf.

Furthermore, even if defendant *were* taking an immunosuppressant medicine for colitis (and, again, there is no evidence to that effect), medical professionals recommend that "people on immunosuppressive therapies can and should get vaccinated" against COVID-19. *See* https://www.healthline.com/health-news/these-prescription-drugs-may-reduce-efficacy-of-covid-19-vaccines. Indeed, while both the CDC and Dr. Anthony Fauci warn that COVID vaccines may offer less robust protection for people with weakened immune systems, both advise that taking an immunosuppressant medicine is not a reason to remain unvaccinated. *See* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations/underlying-conditions.html ("People with . . . weakened immune systems due to . . . medication . . . may receive a COVID-19 vaccine."); https://www.ajmc.com/view/taking-immunosuppressants-fauci-says-get-the-covid-19-vaccine ("[I]f you are on immunosuppressant agents . . . some degree of immunity is better than no degree of immunity. So, for me, it would be recommended that these people do get vaccinated.").

Defendant's risk of serious complications from COVID-19 would be substantially diminished if he had accepted BOP's offer to be vaccinated. The CDC has repeatedly assured the public that "COVID-19 vaccines are effective. They can keep you from getting and spreading the virus that causes COVID-19. COVID-19 vaccines also help keep you from getting seriously ill even if you do get COVID-19." See https://www.cdc.gov/coronavirus/2019-ncov/vaccines/ vaccine-benefits.html (last visited August 9, 2021). Thus, even if defendant *were* at elevated risk from COVID-19 due to his health conditions (and, as discussed above, he has failed to demonstrate that he is), he would be far less likely to suffer exacerbation of those conditions as a result of COVID-19 if he were vaccinated.

Federal courts across the country have recognized the reduced COVID-19 risk faced by vaccinated inmates – even those with underlying medical conditions that would otherwise indicate increased risk of severe complications from COVID-19 infections – and found no extraordinary and compelling reason to release them.[12] Unlike the defendants in those cases, defendant here

---

[12]        *See, e.g., United States v Jackson*, 2021 WL 1927506, at *3 (N.D. Cal. May 13, 2021); *Gale v. United States*, 2021 WL 1912380, at *3 (E.D. Va. May 12, 2021); *United States v. Giles*, 2021 WL 1737755 (D. Minn. May 3, 2021); *United States v. Roe*, 2021 WL 1711296, at *2 (S.D. Ohio Apr. 30, 2021); *United States v. McBriarty*, 2021 WL 1648479, at *6 (D. Conn. Apr. 27, 2021); *United States v. Johnson*, 2021 WL 1550460, at *5 (D. Minn. Apr. 20, 2021); *United States v. Jameson*, 2021 WL 1405598, at *7 (E.D. Cal. Apr. 14, 2021); *United States v. Vasquez-Uribe*, 2021 WL 1248524, at *2 (D.N.J. Apr. 5, 2021); *United States v. Stiver*, 2021 WL 1110593, at *1 (W.D. Pa. Mar. 23, 2021); *United States v. Gabbard*, 2021 WL 1037724, at *3 (E.D. Mich. Mar. 18, 2021); *United States v. Williams*, 2021 WL 966028, at *3 (W.D.N.C. Mar. 15, 2021); *United States v. Ulmer*, 2021 WL 844579, at *2 (E.D. Pa. Mar. 5, 2021); *United States v. Shepard*, 07-cr-85 (RDM) (D.D.C. March 4, 2021) (ECF 66 at 11-12); *United States v. Cortez*, 2021 WL 689923 (D. Ariz. Feb. 23, 2021); *United States v. McGill*, 2021 WL 662182, at *5 (D. Md. Feb. 19, 2021); *United States v. Wakefield*, 2021 WL 640690, at *3 (W.D.N.C. Feb. 18, 2021); *United States v. Pabon*, 2021 WL 603269, at *3 (S.D.N.Y. Feb. 16, 2021); *United States v. Grummer*, 2021 WL 568782, at *2 (S.D. Cal. Feb. 16, 2021); *United States v. Smith*, 2021 WL 364636, at *2 (E.D. Mich. Feb. 3, 2021); *United States v. Ballenger*, 2021 WL 308814, at *5 (W.D. Wash. Jan. 29, 2021); *United States v. Isidaehomen*, 2021 WL 243458, at *3 (N.D Texas January 25, 2021); *United States v. Jones*, 2021 WL 217157, at *5 (E.D. Va. Jan. 21, 2021).

refused to receive a COVID-19 vaccination when it was offered. Defendant cannot show an "extraordinary and compelling reason" for release under the statute where the vaccine has been made available to him, but he refused to accept it based on his self-diagnosed unverified concerns. Defendant's refusal to take advantage of the opportunity to reduce his risk of contracting COVID-19, or serious illness should he contract COVID-19, substantially undermines his assertion that "extraordinary and compelling reasons" warrant his early release from prison.

Moreover, as a matter of basic fairness and public policy, "it would not make sense to grant compassionate release to inmates like the defendant who remain more susceptible to COVID-19 only because they have refused to protect themselves and others by getting vaccinated, but deny compassionate release to inmates who have taken advantage of the vaccine." *United States v. Dempsey*, 2021 WL 2073350, at *4 (D.D.C. May 24, 2021) (McFadden, J.). *See also Broadfield*, 2021 WL 3076863, at *2 ("[A] prisoner who remains at elevated risk because he has declined to be vaccinated cannot plausibly characterize that risk as an 'extraordinary and compelling' justification for release. The risk is self-incurred.").[13]

Defendant has every right to make his own health care decisions, but decisions carry consequences. Here, defendant seeks early release based on his purported health conditions and resulting increased vulnerability to COVID-19, yet he has declined a safe and effective vaccination

---

[13]     *See also, e.g., United States v. Oliver*, 2021 WL 2913627, at *5 (D.D.C. July 12, 2021); *United States v. Winston*, 2021 WL 2592959, at *4 (D.D.C. June 24, 2021); *United States v. Piles,* 2021 WL 1198019, at *3 (D.D.C. Mar. 30, 2021); *United States v. Garcia,* 2021 WL 1499312, at *3 (C.D. Illinois, Apr. 16, 2021); *United States v. Greenlaw,* 2021 WL 1277958, at *7 (D. Me. Apr. 6, 2021); *United States v. Baeza-Vargas*, 2021 WL 1250349, at *2-3 (D. Ariz. Apr. 5, 2021); *United States v. Austin*, 2021 WL 1137987, at *2 (E.D. Mich. Mar. 25, 2021); *United States v. Figueroa*, 2021 WL 1122590, at *5 (E.D. Cal. Mar. 24, 2021); *United States v. Jackson*, 2021 WL 806366, at *1-2 (D. Minn. Mar. 3, 2021); *United States v. King*, 2021 WL 736422, at *2 (S.D.N.Y. Feb. 24, 2021); *United States v. Lohmeier*, 2021 WL 365773, at *2 (N.D. Ill. Feb. 3, 2021); *United States v. McBride*, 2021 WL 354129, at *3 (W.D.N.C. Feb. 2, 2021).

that would significantly reduce this risk. Having been offered, and having refused, the best treatment for COVID-19 that is currently available, both inside and outside BOP, defendant cannot establish an extraordinary and compelling reason for release. A finding to the contrary would be inconsistent with the scientific evidence and the overwhelming weight of case authority.

For all of these reasons, defendant's refusal to accept the COVID-19 vaccine undermines his claim that there exists an "extraordinary and compelling reason" to grant his immediate release, and his compassionate release motion fails for this reason as well.

### D. Defendant's Compassionate Release Motion Also Fails Because the § 3553(a) Factors Do Not Support His Immediate Release

Even if a defendant demonstrates "extraordinary and compelling reasons" on a motion for compassionate release (which, as discussed above, defendant here has failed to do), the Court must also consider the factors enumerated in 18 U.S.C. § 3553(a) to determine whether it is appropriate to grant relief. *See* § 3582(c)(1)(A)(i). The factors that the Court must consider under 18 U.S.C. § 3553(a) include "the nature and circumstances of the offense," "the history and characteristics of the defendant," and also the need for a sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" "to afford adequate deterrence to criminal conduct;" "to protect the public from further crimes of the defendant;" and "to provide the defendant with needed educational or vocational training, medical care, and other correctional treatment in the most effective manner." In addition, the Court may consider post-offense conduct, whether positive or negative, in deciding whether to adjust a previously-imposed sentence. *See Pepper v. United States*, 562 U.S. 476 (2011). The § 3553(a) factors weigh against a sentence reduction in this case that would result in defendant's immediate release.

The nature and circumstances of defendant's offense involved acting as the leader of a violent drug conspiracy that spanned more than a decade. Defendant rose to the level of being "the

exclusive wholesale cocaine and crack distributor for the street level sellers" in his area of the city. Dkt. 330 (Mem. Order 2/11/09) at 2. Defendant and his associates possessed and used guns, and they maintained control over their territory through threatened and actual violence. *See id*. One witness at trial testified that "when [defendant] suspected that he was selling drugs in his territory without permission, [defendant] shot him." *Id*. at 3. Defendant also admitted to another trial witness that "he had been involved in a gun fight in California over a drug deal that fell apart." *Id*. The seriousness of defendant's crimes weighs against a sentence reduction.

Furthermore, defendant's criminal history prior to his convictions in this case involved three felony convictions, including one controlled substance offense and one offense involving illegal possession of a firearm. *See* Dkt. 313 (Presentence Investigate Report or "PSI") ¶¶ 108-10. As the trial judge summarized at defendant's sentencing hearing, defendant "clearly never did anything with his life except deal drugs, was in prison at least twice for it, didn't learn then right from wrong; unbelievably was involved in smuggling drugs in and out of a federal prison down in Virginia . . . and has done nothing to demonstrate that he is entitled to any leniency from the Court." Dkt. 347 at 17. This factor also weighs against compassionate release.

In addition, defendant has a poor post-conviction record of disciplinary infractions and has made relatively sparse efforts to participate in rehabilitative programming during his incarceration. Defendant has committed ten infractions while serving his sentence in this case. *See* Ex. 4 (BOP Disciplinary Record); *see also* Dkt. 594 at 2. Despite defendant's insistence that at 47 years old, he has "aged out" of misconduct, Dkt. 601 at 3, he has committed five disciplinary infractions in just the last three years, and one as recently as September 2020. *See* Ex. 4 at 1-2. In 2016, at the age of 42, defendant was sanctioned for committing an assault and for possessing a hazardous tool,

which is a 100-level offense (BOP's most serious designation). *See id*. at 3. In 2019, at the age of 45, he was again sanctioned for possessing a hazardous tool. *See id*. at 1.

Furthermore, defendant's sparse programming record shows that he has made relatively few efforts toward rehabilitation. From 2007, when he was first incarcerated in this case, through 2020, defendant completed only 96 hours of BOP programs, 64 of which involved keyboarding classes. *See* Ex. 5 (BOP Education Data Transcript). Defendant thus averaged less than 3 hours per year of non-keyboarding programs during his first 13 years of incarceration in this case. Earlier this year, while defendant's sentence reduction motions pursuant to the First Step Act § 404 and 18 U.S.C. § 3582(c)(2) were pending, defendant dramatically increased his programming record, earning his GED and completing eight other BOP educational programs. *See id*. While defendant's recent surge of programming courses is commendable, it appears to have effectively stopped after the Court issued a ruling on defendant's previous sentence reduction motions in May 2021. *See id*. In view of defendant's overall history of minimal programming, the government views this short-lived run of intensive program completion in early 2021 with a certain degree of skepticism.

For all of these reasons, even if defendant had demonstrated an "extraordinary and compelling reason" under § 3582(c)(1)(A) (and, again, he has not), the § 3553(a) factors weigh against granting his release based upon the seriousness of his offense, his criminal history, and his poor post-conviction conduct.

## **CONCLUSION**

For the reasons discussed herein, the Court should summarily deny defendant's instant Motion for Relief Under 18 U.S.C. § 3582(c)(1)(A).[14]

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
D.C. Bar Number 415793

MARGARET J. CHRISS
Chief, Special Proceedings Division
D.C. Bar Number 452403

__ /s/ Timothy R. Cahill_____
TIMOTHY R. CAHILL
Assistant United States Attorney
Special Proceedings Division
D.C. Bar Number 1032630
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 252-7270
Timothy.Cahill@usdoj.gov

---

[14]  If, contrary to the government's position, the Court determines to grant a sentence reduction based upon defendant's compassionate release motion, it may "impose a term of . . . supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment." § 3582(c)(1)(A). In imposing a term of supervised release, the court may impose a period of home confinement as a condition of supervised release, provided that the court finds that home confinement is a "substitute for imprisonment." U.S.S.G. § 5F1.2; *see* 18 U.S.C. § 3583(d). Alternatively, a court may consider modifying an existing term of supervised release to add a period of home confinement, consistent with U.S.S.G. § 5F1.2. *See* § 3583(e)(2).

In addition, if the Court decides that a sentence reduction is appropriate, we respectfully submit that the Court should direct a 14-day quarantine period and medical clearance prior to release to minimize the possibility of any spread of COVID-19 from the defendant to the public.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 9, 2021, I caused a copy of the foregoing opposition to be served on counsel of record via the Court's Electronic Case Filing system.

*/s/ Timothy R. Cahill*

TIMOTHY R. CAHILL
Assistant United States Attorney